UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
ROBERT L. GARBER, On Behalf of Himself : Civil Action No. 07-4774
and All Others Similarly Situated, :
: CLASS ACTION
Plaintiff, :
: COMPLAINT FOR VIOLATION OF THE
vs. : FEDERAL SECURITIES LAWS
:
MACY'S INC. (f/k/a FEDERATED :
DEPARTMENT STORES, INC.), TERRY J. :
LUNDGREN and KAREN M. HOGUET, :
:
Defendants. :
: DEMAND FOR JURY TRIAL
---------------------------------------------------------------x

## INTRODUCTION

1.  This is a securities class action on behalf of purchasers of Macy's Inc. (formerly known as Federated Department Stores, Inc.) ("Macy's" or the "Company") publicly traded securities during the period from February 8, 2007 to May 15, 2007 (the "Class Period"), against Macy's and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.  Macy's, the second-largest U.S. department store franchise, operates more than 850 department stores in 45 states, the District of Columbia, Guam and Puerto Rico under the names of Macy's and Bloomingdale's. The Company also sells its apparel and accessories, cosmetic, home furnishings and other consumer goods electronically through macys.com, bloomingdales.com and Bloomingdale's By Mail. Macy's, then known as Federated Department Stores, Inc. ("Federated"), acquired May Department Stores Co. ("May") for $11 billion in August 2005. Federated changed its name to Macy's effective June 1, 2007.

3.  The Company's stock price increased dramatically on February 8, 2007 – on more than twice the average daily trading volume over the preceding ten days – when it reported January sales and preliminary fourth-quarter profit that exceeded estimates. Fourth quarter earnings were $1.60 per share, exceeding the Company's prior guidance of $1.50 per share. Defendants forecast a 2% to 3% rise in February same-store sales. February 2007 sales would be the first to include the more than 400 former May stores which Macy's had converted to the Macy's name in September 2006. The May stores acquisition more than doubled the number of Macy's stores to over 800. Macy's promised to make the old May stores more profitable by toning down promotional sales programs, adding more expensive merchandise like Coach handbags, and selling more exclusive goods from designers like Oscar de La Renta and private-label brands under names like Alfani.

4. Throughout the Class Period, defendants provided positive sales guidance citing acceptance of the conversion by former May customers and improving sales at the newly converted May store locations. Depending on the local market, defendants stated they were upgrading May's merchandise to something more upscale and akin to Macy's and were weaning May customers from May's more aggressive promotional posture. While sales growth had declined moderately at the end of 2006, by the start of the Class Period defendants were reporting that their integration efforts were succeeding, sales growth was returning and the Company's operating margins would widen in 2007 as merger synergies of $450 million were realized.

5. The Class Period commences February 8, 2007, more than one month into the Company's first quarter 2007 ("1Q 07"). Between February 8, 2007 and May 15, 2007, defendants would cause Macy's shares to trade at artificially inflated levels by concealing that the May integration was actually failing, sales growth was diminishing, the Company's business had deteriorated, and as a result, its sales projections were grossly overstated. Key factors defendants promised would drive sales increases included the ongoing roll-out of the Reinvent Program at the former May stores and May's customers becoming more acclimated to Macy's value driven products versus couponing. Defendants' positive statements had their intended effect and the Company's stock price spiraled to a Class Period high of $46.70 by March 23, 2007.

6. Then, Macy's stock price plummeted between May 10, 2007 and May 15, 2007, as the Company disclosed that customers of the former May stores had actually rejected the rapid conversion, that sales at the Company's new Macy's stores had declined during 1Q 07, and that in particular, the Company's decision to dramatically cut the number of days coupons could be used at the former May locations had badly damaged sales. "'By cutting back as hard as we did, we clearly hurt the business,'" Chief Financial Officer Karen M. Hoguet stated on May 14, 2007. First quarter

2007 revenue significantly missed the Company's earlier forecast of $6.1 billion, coming in 2% lower at $5.92 billion. Sales at stores open at least a year rose only 0.6%, missing the Company's guidance of a 2.5% to 3.5% gain. The sales growth declines were specific to Macy's and not industry wide. Same-store sales actually rose 2.2% at J.C. Penney, 4.3% at Target and 9.5% at Nordstroms during the same period. Macy's lowered its own 2Q 07 sales forecast from $6.2 to $6.1 billion and its profit forecast from $0.40-$0.45 per share to $0.35-$0.45 per share. On this news, the Company's stock price plunged to a price nearly 18% lower than its Class Period high, erasing over $3 billion in market capitalization.

## JURISDICTION AND VENUE

7.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5 promulgated thereunder. Jurisdiction is conferred by §27 of the 1934 Act.

8.  Venue is proper pursuant to §27 of the 1934 Act as defendant Macy's and/or the Individual Defendants conduct business in and the wrongful conduct took place in this District, and the Company's principal executive offices are in New York, New York, where the day-to-day operations of the Company are directed and managed.

## THE PARTIES

9.  Plaintiff Robert L. Garber ("Garber") purchased Macy's publicly traded securities as detailed in the attached Certification and was damaged thereby.

10.  Defendant Macy's operates retail stores throughout the United States and sells through catalogs and the Internet. The Company's headquarters are located at 151 West 34th Street, New York, New York. As of March 2, 2007, the Company had over 454 million shares issued and outstanding that, effective June 1, 2007, trade on the New York Stock Exchange under the ticker symbol "M."

11. Defendant Terry J. Lundgren ("Lundgren") is, and was at all times relevant hereto, Chairman, President and Chief Executive Officer ("CEO") of Macy's.

12. Defendant Karen M. Hoguet ("Hoguet") was, at times relevant hereto, Executive Vice President and Chief Financial Officer ("CFO") of Macy's.

13. The individuals named as defendants in ¶¶11-12 are referred to herein as the "Individual Defendants." They are liable for the false and misleading statements set forth at ¶¶16-21.

## DEFENDANTS' SCIENTER

14. Defendants are Macy's, its CEO/President/Chairman and its CFO. Both of these executives, by virtue of their high-level positions with Macy's, directly participated in the management of Macy's, were directly involved in the day-to-day operations of Macy's at the highest levels and were privy to confidential proprietary information concerning Macy's and its business, operations, products, growth, financial statements and financial condition and were aware of or deliberately disregarded that the false and misleading statements made by and regarding the Company were still alive in the market and causing the Company's stock to trade at inflated prices. Because of their managerial positions with Macy's, each had access to the adverse undisclosed information about Macy's business, financial condition and prospects and knew (or deliberately disregarded) that the adverse facts alleged herein rendered the positive representations made during the Class Period materially false and misleading.

15. Each Individual Defendant was personally familiar with the quality of the Company's projected earnings and the deleterious effect the rapid conversion of merchandise and elimination of promotional sales efforts was having at the former May stores because they monitored Macy's revenues and were closely monitoring the performance of Macy's operations via reports from Macy's finance department, which were generated and provided to them on a regular basis. The

- 4 -

reports summarized the Company's sales practices, inventory levels and promotional sales results. As a result of their monitoring, each of the Individual Defendants was aware that Macy's would be unable to meet its own projected sales targets and financial results.

### FALSE AND MISLEADING STATEMENTS

16. On February 8, 2007, the Company issued a press release entitled "Federated's January Same-Store Sales up 8.6% - Company Raises Earnings Guidance for Fiscal 2006 Fourth Quarter." The release stated in relevant part:

> *The company increased its guidance for earnings from continuing operations for the fourth quarter of fiscal 2006. Excluding merger integration costs and related inventory valuation adjustments, the company now expects fourth quarter earnings from continuing operations of $1.55 to $1.60 per share, compared with previous guidance of $1.40 to $1.50 per share.* The revised guidance includes a one-time gain of 6 cents per share related to completion of its debt tender offer, as announced in December 2006.
>
> *"January represented a strong finish to our fiscal year, with an outstanding performance in legacy Macy's and Bloomingdale's stores, as well as continued improvement in sales trends at former May Company locations,"* said Terry J. Lundgren, Federated's chairman, president and chief executive officer. "Sales were stimulated in part by redemption of gift cards sold during the holiday season and the arrival of cold weather in much of the country."
>
> "All in all, 2006 was a great year in which we transformed our company and embraced an extraordinary amount of positive change while exceeding our initial earnings targets," Lundgren said. *"This is a testament to the strategy we have put in place and to the strength of our organization. We look forward to this momentum carrying into 2007."*
>
> *Federated expects same-store sales to increase by 2 percent to 3 percent in February. Beginning in February, Federated's same-store sales will include former May Company locations, as well as legacy Macy's and Bloomingdale's stores, that have been open for more than one full fiscal year.*

17. On February 27, 2007, the Company issued a release entitled "Federated Reports Fourth Quarter Earnings of $1.45 Per Diluted Share from Continuing Operations; Diluted EPS From Continuing Operations, Excluding Merger Integration Costs and Inventory Valuation Adjustments, is $1.66 - Exceeding the Company's Guidance." The release stated in relevant part:

Federated Department Stores, Inc. today reported diluted earnings per share from continuing operations of $1.45 for the 14-week fourth quarter of 2006, ended Feb. 3, 2007. This compares with diluted earnings per share from continuing operations of $1.22 for the 13-week period ended Jan. 28, 2006.

Excluding May Company merger integration costs and related inventory valuation adjustments of $177 million ($110 million after tax or 21 cents per diluted share), fourth quarter diluted earnings per share from continuing operations were $1.66. ***This exceeds the company's prior guidance, provided on Feb. 8, 2007, for earnings of $1.55 to $1.60 per share excluding merger integration costs and related inventory valuation adjustments.*** Earnings for the 2006 fourth quarter include a gain of approximately $54 million ($34 million after tax or 6 cents per diluted share) related to completion of the company's debt tender offer, as previously announced.

18.  On March 8, 2007, the Company issued a press release entitled "Federated's February Same-Store Sales Up 1.2%." The release stated in relevant part:

Federated Department Stores, Inc. today reported total sales of $1.802 billion for the four weeks ended March 3, 2007, essentially flat compared to total sales of $1.800 billion in the same period last year. On a same-store basis, Federated's sales for February were up 1.2 percent. This compares with the company's guidance for a same-store sales increase of 2 percent to 3 percent in February.

*"Sales in February were impacted by a series of snow and ice storms in the eastern half of the U.S., including those during the important selling days immediately preceding Valentine's Day. The geographic region that was most affected by adverse weather was the Upper Midwest,"* said Terry J. Lundgren, Federated's chairman, president and chief executive officer. *"Aside from the weather, we were pleased with performance of both the new and legacy Macy's stores."*

***Federated expects same-store sales in both March and April to increase by 2.5 percent to 4 percent.***

Beginning in February and now ongoing, Federated's same-store sales include former May Company locations, as well as legacy Macy's and Bloomingdale's stores, that have been open for more than one full fiscal year.

19.  On April 4, 2007, the Company issued a press release entitled "Federated Invests for Continued Growth in Direct-to-Consumer Businesses." The press release stated in relevant part:

Federated Department Stores, Inc. today announced an additional capital investment of approximately $100 million in 2007-2008 to support continued growth in its direct-to-consumer businesses, including macys.com, bloomingdales.com, Bloomingdale's By Mail, macysweddingchannel.com and bloomingdaleswedding

- 6 -

channel.com. The amount is incorporated in Federated's total capital spending plans, which include $1.2 billion in 2007 and $1.1 billion in 2008.

*"Our online sales continue to grow at a rapid pace as the national expansion of Federated and Bloomingdale's attracts new customers to our stores, Web sites and catalog," said Terry J. Lundgren, Federated's chairman, president and chief executive officer. "In particular, we are seeing exceptional growth in online sales in new Macy's markets such as Illinois, Michigan, Minnesota, Missouri, Oklahoma, Texas and Utah.*

*"Currently, we anticipate our direct-to-consumer businesses will grow to more than $1 billion in sales by 2008 from about $620 million in 2006," he said. "Supporting this pace of growth requires additional investment so we can scale up the volume of business while enhancing customer service, delivery efficiency and online site functionality."*

New investments will include the building of a 600,000-square-foot distribution center in Goodyear, AZ, which will serve primarily as the West Coast shipping point for macys.com. Construction on this facility will begin in spring 2007 and is scheduled for completion in spring 2008. The facility will employ more than 500 full-time associates when completed and fully operational. The Goodyear distribution center is designed to accommodate a future expansion of 400,000 square feet.

Also included in the 2007-2008 capital plan are an expansion of the direct-to-consumer warehouse management system, improvements to the order management system and enhancements to the macys.com Web site to support projected increases in customer traffic.

20. On April 12, 2007, the Company issued a press release entitled "Federated's March Same-Store Sales up 2.3%." The release stated in relevant part:

Federated Department Stores, Inc. today reported total sales of $2.288 billion for the five weeks ended April 7, 2007, an increase of 1.5 percent compared to total sales of $2.255 billion in the same period last year. On a same-store basis, Federated's sales for March were up 2.3 percent. This compares with the company's guidance for a same-store sales increase of 2.5 percent to 4 percent in March.

For the year to date, Federated's sales totaled $4.089 billion, up 0.8 percent from total sales of $4.055 billion in the first nine weeks of 2006. On a same-store basis, Federated's year-to-date sales were up 1.8 percent.

*"March sales fell just short of our expectations in most regions across the country, largely attributable to weakness in home-related merchandise categories," said Terry J. Lundgren, Federated's chairman, president and chief executive officer. "Unseasonably cold weather as new spring merchandise flowed into the*

*stores in the pre-Easter period also contributed to disappointing sales in the month."*

***Federated continues to expect same-store sales in April to increase by 2.5 percent to 4 percent. Sales in the first quarter are expected to be at the low end of previous guidance of $6 billion to $6.1 billion.***

21.  Beginning on May 10, 2007, defendants shocked the market by revealing first that the Company's April same-store sales were down 2.2%. Lundgren stated that "'April sales were disappointing across the country in both new and legacy Macy's stores'" and that a "'major promotional event that was shifted from May last year to April this year did not produce the results we expected.'" The Company's release also stated that the Company expected same-store sales in May 2007 "to be in the range of flat to down 2 percent, which reflects the promotional event shift from May into April."

22.  On May 16, 2007, before the market opened, the Company issued a press release entitled "Federated Reports First Quarter Earnings of 11 Cents Per Diluted Share from Continuing Operations, up from a Loss of 13 Cents Per Diluted Share Last Year; Diluted EPS is 16 Cents, Excluding Merger Integration Costs." The release quoted Lungren as stating that *"sales in the new Macy's locations were disappointing in the quarter,"* and stated in relevant part:

> Federated's guidance is for total sales of $6.0 billion to $6.1 billion in the second quarter, compared with previous guidance of $6.1 billion to $6.2 billion. On a same-store basis, the company expects second quarter sales to be flat to up 2 percent, versus prior guidance of up 1.5 percent to 2.5 percent. Earnings per diluted share, excluding merger integration costs, are now expected to be in the range of 35 to 45 cents, compared with previous guidance of 40 to 45 cents, in the second quarter. The revised second quarter guidance reflects management's concern about uncertainty in the economic environment.

23.  Defendants disclosed that customers of the former May stores had rejected the rapid conversion, that sales at the Company's new Macy's stores had declined during the 1Q 07, and that, in particular, the Company's decision to dramatically cut the number of days coupons could be used at the former May locations had badly damaged sales. "'By cutting back as hard as we did, we

- 8 -

clearly hurt the business,'" defendant Hoguet stated on May 14, 2007. First quarter 2007 revenue significantly missed the Company's earlier forecast of $6.1 billion, coming in 2% lower at $5.92 billion. Sales at stores open at least a year rose only 0.6%, missing the Company's guidance of a 2.5% to 3.5% gain. Meanwhile, same-store sales rose 2.2% at J.C. Penney, 4.3% at Target and 9.5% at Nordstroms. The Company lowered its 2Q 07 sales forecast from $6.2 to $6.1 billion and its profit forecast from $0.40-$0.45 per share to $0.35-$0.45 per share. The Company's stock price plunged to a price nearly 18% lower than its Class Period high, erasing over $3 billion in market capitalization.

24. The statements set forth at ¶¶16-21 were alive, uncorrected and reflected in the market price of Macy's stock during the Class Period. The statements were affirmatively false and misleading in failing to disclose the following facts which were then existing, known or recklessly disregarded by defendants to be false, and necessary to be disclosed to make defendants' earlier statements – then still alive in the market – not misleading, including the following:

(a) The dramatic reduction in promotional sales programs and decreases in the number of days coupons could be used at the former May stores were significantly discouraging sales at those stores and reducing revenues;

(b) The former May customers were not "acclimating" to the new higher end offerings and were instead shopping elsewhere;

(c) The declining sales the former May stores were experiencing were not attributable to "cold weather";

(d) The integration of the former May stores into the Macy's business model was not succeeding; and

(e)   Defendants knew Macy's's sales forecasts for 1Q 07 would not be met based on sales data available to defendants throughout the Class Period.

## CLASS ACTION ALLEGATIONS

25.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Macy's (then known as Federated) publicly traded securities on the open market during the Class Period (the "Class"). Excluded from the Class are defendants, directors and officers of Macy's and their families and affiliates.

26.   The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. During the Class Period, Macy's had over 454 million shares of stock outstanding, owned by thousands of persons.

27.   There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)   Whether the 1934 Act was violated by defendants;

(b)   Whether defendants omitted and/or misrepresented material facts;

(c)   Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)   Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)   The extent of damage sustained by Class members and the appropriate measure of damages.

## LOSS CAUSATION/ECONOMIC HARM

28. During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Macy's stock price and operated as a fraud or deceit on Class Period purchasers of Macy's stock by misrepresenting the Company's business success and future business prospects. When defendants' falsehoods, misrepresentations and omissions were disclosed and became apparent, Macy's stock price fell precipitously as some of the prior artificial inflation came out of the stock. As a result of their purchases of Macy's stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

29. Defendants' false and misleading statements and omissions had the intended effect and caused Macy's stock to trade at artificially inflated levels throughout the Class Period, reaching a Class Period high of $46.70 per share on March 23, 2007, before collapsing below $40 per share on May 16, 2007 – an 18% decline.

30. The 18% decline in Macy's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud being partially revealed to investors and the market. The timing and magnitude of Macy's stock price declines negate any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. During the same period in which Macy's stock price fell 18% as a result of defendants' fraud being revealed, the Standard & Poor's 500 securities index was essentially flat. The economic loss, *i.e.*, damages, suffered by plaintiff and other members of the Class was a direct result of defendants' fraudulent scheme to artificially inflate Macy's stock price and the subsequent significant decline in the value of Macy's stock when defendants' prior misrepresentations and other fraudulent conduct was revealed.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

31.     Plaintiff incorporates ¶¶1-30 by reference.

32.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

33.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Macy's publicly traded securities during the Class Period.

34.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Macy's publicly traded securities. Plaintiff and the Class would not have purchased Macy's publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

35.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Macy's publicly traded securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

36. Plaintiff incorporates ¶¶1-35 by reference.

37. The Individual Defendants acted as controlling persons of Macy's within the meaning of §20(a) of the 1934 Act. By reason of their positions as officers and/or directors of Macy's, and their ownership of Macy's stock, the Individual Defendants had the power and authority to cause Macy's to engage in the wrongful conduct complained of herein. Macy's controlled the Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of himself and the Class, prays for judgment as follows:

A. Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding plaintiff and other members of the Class damages together with interest thereon;

C. Awarding plaintiff and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D. Awarding plaintiff and other members of the Class such equitable/injunctive or other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: June 4, 2007

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN (SR-7957)
DAVID A. ROSENFELD (DR-7564)

/s/ David A. Rosenfeld
DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
MARY K. BLASY
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

LAW OFFICES OF ALFRED G.
  YATES, JR., P.C.
ALFRED G. YATES
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Telephone: 412/391-5164
412/471-1033 (fax)

Attorneys for Plaintiff

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

Robert L. Garber ("Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed the class action complaint and authorizes its filing and is willing to serve as a lead or named plaintiff in the action on the basis of the allegations in that complaint or a substantively similar or related complaint or amended complaint to be filed.

2. Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff's transactions in Federated Department Stores, Inc. (FD) now know as Macy's, Inc. (M) that are the basis of this litigation are listed below:

| Trade Date | No. of Shares | Price Per Share | Buy or Sell |
|---|---|---|---|
| March 10, 2007 | 20 | $44.30000 | Buy |
| April 3, 2007 | 25 | $45.59850 | Buy |
| April 9, 2007 | 20 | $46.05180 | Buy |
| April 24, 2007 | 15 | $44.47800 | Buy |
| May 10, 2007 | 20 | $42.74080 | Buy |
| May 10, 2007 | 20 | $42.74080 | Buy |
| May 16, 2007 | 20 | $39.72730 | Buy |

5. During the three years prior to the date of this Certification, Plaintiff has sought to serve or served as a representative party for a class in a case under the federal securities laws, as follows: In re Federal Home Loan Mortgage Corp. Sec. & Der. Litig. (No. II) 1:04-md-01584-JES USDC SD NY; In re Fannie Mae Sec. Litig. No. 04-01639 USDC DC; Robert L. Garber v. Renaissance Re Holdings Ltd. No. 05-7232 USDC SD NY; Boston Scientific Sec. Litig. No 05-12157 USDC Ma.; In re KLA-Tencor Corp. Sec. Litig. 06-04065 USDC ND CA; Robert L. Garber v. Juniper Networks Inc., USDC ND CA 06-4327, Garber v. Legg Mason, Inc., No. 06-09436 USDC SD NY

6. The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct

Executed this 1st day of June, 2007

*Robert L. Garber* (signature)

Robert L. Garber