UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ———————————————— x | | |
| In re MACY'S, INC. SECURITIES LITIGATION | : : : | Master File No. 1:07-cv-04774-AKH CLASS ACTION |
| ———————————————— | : | |
| This Document Relates To: | : : : | CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE |
| ALL ACTIONS. | : : | FEDERAL SECURITIES LAWS |
| ———————————————— x | | |

Lead Plaintiff Pinellas Park Retirement System (General Employees) ("Pinellas Park," "Lead Plaintiff" or "Plaintiff") makes the following allegations, except as to allegations specifically pertaining to Plaintiff and Plaintiff's counsel, based upon the investigation undertaken by Plaintiff's counsel, which included analysis of publicly available news articles and reports, public filings, securities analysts' reports and advisories about Macy's Inc. ("Macy's" or the "Company") (formerly known as Federated Department Stores, Inc. ("Federated")) , press releases and other public statements issued by the Company, interviews with former employees of Macy's, and media reports about the Company, and believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of purchasers of Macy's publicly traded securities during the period February 8, 2007 to May 15, 2007 (the "Class Period"), against Macy's and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Defendant Macy's, the second-largest U.S. department store franchise, operates more than 850 department stores in 45 states, the District of Columbia, Guam and Puerto Rico under the names of Macy's and Bloomingdale's.  The Company also sells its apparel and accessories, cosmetic, home furnishings and other consumer goods electronically through www.macys.com, www.bloomingdales.com and Bloomingdale's By Mail.

3.      This case concerns Macy's acquisition and integration of May Department Stores Co. ("May") and the re-branding of the former May stores to Macy's stores.  In August 2005, Macy's completed the acquisition of May for $11 billion.  The May stores acquisition more than doubled the number of Macy's stores to over 800 stores.  Following the acquisition, Macy's promised to make the old May stores more profitable by toning down promotional sales programs, adding more

expensive merchandise like Coach handbags, and selling more exclusive goods from designers like Oscar de La Renta and private-label brands under names like Alfani. Throughout the Class Period, Defendants provided positive sales guidance citing acceptance of the conversion by former May customers and improving sales at the newly converted May store locations. Depending on the local market, Defendants stated they were upgrading May's merchandise to something more upscale and akin to Macy's and were weaning May customers from May's more aggressive promotional posture. While sales growth had declined moderately at the end of 2006, by the start of the Class Period, Defendants were reporting that their integration efforts were succeeding, sales growth was returning and the Company's operating margins would widen in 2007 as merger synergies of $450 million were realized.

4.      The Class Period commences February 8, 2007. On that date, Macy's reported that fourth quarter earnings would be $1.60 per share, as compared to the Company's prior guidance of $1.50 per share, and forecast a 2% to 3% rise in February 2007 same-store sales – which would be the first same-stores sales figures to include the more than 400 former May stores which Macy's had converted to the Macy's name in September 2006. In response to this announcement, the price of Macy's stock increased from $40.88 per share on February 7, 2007, to $42.41 per share on February 8, 2007.

5.      Throughout the Class Period, the price of Macy's stock continued to increase as the Company reported positive operating trends. By March 23, 2007, the price of Macy's stock had increased to $46.70 per share – more than a 14% increase from the start of the Class Period. Yet, Defendants knew what the market did not - - the re-branding of the former May Stores was not being well received and was causing a substantial slow-down in sales and would negatively impact the Company's same-store sales figures - - a key operating metric looked at by investors and analysts.

Then, with Macy's stock trading at inflated levels, the Individual Defendants (defined below) and other Macy's insiders dumped 1.1 million shares of their personally-held Macy's common stock generating proceeds of $51.4 million.

6.    After the insider-trading spree stopped, Macy's revealed what Defendants knew all along - - the re-branding of the former May stores was a failure.  Between May 10, 2007 and May 15, 2007, Macy's disclosed that customers of the former May stores had actually rejected the rapid conversion, that sales at the Company's new Macy's stores had declined during the first quarter of 2007, and that the Company's decision to dramatically cut the number of days coupons could be used at the former May locations had badly damaged sales.  "By cutting back as hard as we did, we clearly hurt the business," Chief Financial Officer Karen M. Hoguet stated on May 14, 2007.  First quarter 2007 revenue significantly missed the Company's earlier forecast of $6.1 billion, coming in 2% lower at $5.92 billion.  Sales at stores open at least a year rose only 0.6%, missing the Company's guidance of a 2.5% to 3.5% gain.  The sales growth declines were specific to Macy's and not industry wide.  Same-store sales actually rose 2.2% at J.C. Penney, 4.3% at Target and 9.5% at Nordstroms during the same period.  Macy's lowered its own 2Q 07 sales forecast from $6.2 to $6.1 billion and its profit forecast from $0.40-$0.45 per share to $0.35-$0.45 per share.  On this news, the Company's stock price plunged to a price nearly 18% lower than its Class Period high, erasing over $3 billion in market capitalization.

7.    The following chart graphically depicts Defendants' fraudulent scheme, key events during the Class Period and the devastating impact on the Class:



**Macy's**

**January 3, 3007 - May 24, 2007**

JURISDICTION AND VENUE

8.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act

and Rule 10b-5 promulgated thereunder.  Jurisdiction is conferred by Section 27 of the Exchange

Act.

9.      Venue is proper pursuant to Section 27 of the Exchange Act as Defendant Macy's

and/or the Individual Defendants conduct business in and the wrongful conduct took place in this

District, and the Company's principal executive offices are in New York, New York, where the day-to-day operations of the Company are directed and managed.

## PARTIES

10.    Lead Plaintiff Pinellas Park purchased Macy's common stock during the Class Period, as detailed in its Certification previously submitted in this litigation and incorporated herein by reference, and was damaged thereby.

11.    Defendant Macy's operates retail stores throughout the United States and sells merchandise through catalogs and the Internet.  The Company's headquarters are located at 151 West 34th Street, New York, New York.  As of November 24, 2006, Macy's had over 525 million shares issued and outstanding.  Repurchases of Macy's common stock through Company-funded open-market transactions, reduced the number of outstanding shares to 454 million as of March 2, 2007.  Effective June 1, 2007, Macy's common stock traded on the New York Stock Exchange under the ticker symbol "M."

12.    Defendant Terry J. Lundgren ("Lundgren") is, and was at all times relevant hereto, Chairman, President and Chief Executive Officer ("CEO") of Macy's.

13.    Defendant Karen M. Hoguet ("Hoguet") was, at times relevant hereto, Executive Vice President and Chief Financial Officer ("CFO") of Macy's.

14.    Defendants Lundgren and Hoguet are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### The Company And The May Acquisition

15.    On August 30, 2005, Macy's completed the acquisition of The May Department Stores Company ("May").  The acquired May operations included approximately 500 department stores operating under the names Famous-Barr, Filene's, Foley's, Hecht's, Kaufmann's, Lord &

Taylor, L.S. Ayres, Marshall Field's, Meier & Frank, Robinsons-May, Strawbridge's, and The Jones Store.[1]  The aggregate purchase price for the May acquisition was approximately $11.7 billion, including approximately $5.7 billion of cash and approximately 200 million shares of Company common stock and options to purchase an additional 18.8 million shares of Company common stock valued at approximately $6.0 billion in the aggregate.  The Company also assumed approximately $6.0 billion of May debt.  Following the acquisition, Macy's operations more than doubled in size to include approximately 850 department stores covering seven geographic regions.

16.     During 2005 and 2006 Macy's reported that the merger of May/Macy's operations resulted in approximately $822 million of "integration costs," including inventory write-offs.  An additional $125 million in merger related costs were expected to be incurred during fiscal 2007.  The Company has also reported that the "consolidation of central functions, division integrations and the adoption of best practices across the combined companies" was expected to result in $450 million in annual cost savings starting in 2007.  Approximately 6,200 May divisional and corporate jobs were expected to be eliminated as a result of merger and consolidation process.

17.     During September 2005, Macy's released information concerning the planned integration of May and Macy's operations.  In February 2006, Macy's planned to realign its geographic divisions to include the acquired May stores.  In March 2006, the Company planned to begin phasing-out May centralized functions and corporate offices.  By the Fall of 2006, the Company planned to rename all of the retained May stores, including Marshal Field's, operating

---

[1]     Macy's sold the Lord & Taylor chain of stores in October 2006 for a loss of approximately $38 million.  In addition, the May acquisition included approximately 800 formalwear and bridal stores which the Company intended to divest.  As of the start of the Class Period, approximately 300 of these stores were sold for a loss of $18 million.

under regional names to the "Macy's" brand. A press release issued on September 20, 2005, by the

Company discussing the integration stated in pertinent part:

> Federated Department Stores, Inc. (NYSE:FD) (PCX:FD) today announced a series of strategic decisions to build its nationwide Macy's and Bloomingdale's brands and reduce costs.
>
> *       *       *
>
> All Marshall Field's stores will convert to the Macy's nameplate in fall 2006. This includes 62 locations in Michigan, Illinois, Minnesota, Wisconsin, North Dakota, Indiana, Ohio and South Dakota that will continue to be operated by the Minneapolis-based division that will become known as Macy's North.
>
> *       *       *
>
> Beginning Feb. 1, 2006, about 850 Macy's stores (including May Company locations to be converted to the Macy's nameplate in 2006 and excluding stores announced for divestiture) will operate through seven geographic divisions, each responsible for store management and operations, soft goods merchandise buying and planning, human resources, finance, marketing, visual merchandising and other functions in its region. The New York-based Macy's Home Store division will retain responsibility for home-related merchandising and marketing in all Macy's stores, including (beginning in 2007) those to be operated by the newly created Macy's Midwest and Macy's North divisions.
>
> *       *       *
>
> Following these realignments in February 2006, Federated will gradually phase out central office operations of the Filene's/Kaufmann's division in Boston, Foley's division in Houston, Hecht's/Strawbridge's division in Arlington, VA, and Robinsons-May/Meier & Frank division in Los Angeles. These consolidations will affect approximately 4,500 divisional headquarters employees. As many affected divisional headquarters employees as possible will be offered positions elsewhere in the company.
>
> *       *       *
>
> Federated will begin phasing out operations at the May Company corporate headquarters and May Merchandising Corporation offices in St. Louis on March 1, 2006, with most positions eliminated by the end of 2006. Some limited functions may remain for as much as 36 months. Together, these two organizations currently employ approximately 1,700 persons.

18.     Throughout 2006, Defendants repeatedly reported that the May integration was

proceeding as planned and was "on track." During a November 8, 2006 conference call Hoguet

described the re-branding efforts which converted old May stores to new Macy's stores as a success stating in pertinent part as follows:

> The third quarter was a big one for us.  September 9th marked the culmination of all the hard work and effort that went into preparing all of the former May doors to be converted to Macy's.  ***The brand launch was very successful and we are very proud of what we accomplished in the first year of owning the May Company.***
>
> While we would have liked to have seen more progress in the performance of our new Macy's or former May doors post-launch, we did see a lot of progress and reason to be confident about the future, especially in the soft goods part of the business.  ***Customers in the former May doors responded well to our private brands and the market goods that were more interesting and more differentiated.*** [Emphasis added.]

19.    The integration of May/Macy's operation was substantially complete by February 2007.

### The Re-Branding Program Was Not Successful and
### Sales at the Former May Stores Were Declining

20.    By the start of the Class Period, unbeknownst to investors, the re-branding of the May company stores was not meeting with success and the Company was losing May's traditional client base by dramatically changing the marketing and promotional activity at converted May stores.  As a result, sales at the former May stores were dramatically declining.  When sales figures from the former May stores were included in Macy's same-store sales figures, as they would be in February 2007, those figures would be negatively impacted.

21.    In September 2006, Defendants changed the name of May stores to Macy's and, at the same time, eliminated the promotional and marketing activity that had been historically employed at May.  In particular, Defendants substantially eliminated the coupon-based promotional activity employed by May in favor of credit card promotions.  In conjunction with the cessation of coupon promotions, the Company substantially upgraded the inventory at converted May stores to

bring it more in line with Macy's.  These changes were not well received by customers and sales at former May stores dramatically declined from historic levels.

22.    Defendants knew or recklessly disregarded that the cessation of coupon promotions and the re-branding of May stores would cause a substantial disruption to the sales activity at converted May stores because of extensive market research studies that they had completed prior to the start of the Class Period.  Beginning in late 2004, while the acquisition of May was agreed to but not yet consummated, Macy's began conducting substantial market research, which included implementing a series of customer surveys and focus groups, in order to better predict the reaction of former May customers with regard to the re-branding and change in promotional activity.  In connection with the market research, Macy's retained Lowe New York ("Lowe"), a New-York based advertising agency.

23.    The findings of the market research were compiled by Lowe and presented to Macy's senior management in a highly detailed and lengthy study report (the "Lowe Report").  The Lowe Report indicated that there would be a significant customer backlash as a result of the nationwide re-branding, store make-overs and marketing transition away from promotional events and coupons.

24.    By the start of the Class Period, Defendants knew or recklessly disregarded that, as the Lowe Report had forewarned, the re-branding of the May stores was being negatively received by customers and was causing sales at former May stores to dramatically decline and that this trend was worsening.  As detailed  herein, Defendants have now admitted that in February and March sales at the former May stores were weak.

## Materially False And Misleading
## Statements Issued During The Class Period

25.    The Class Period starts on February 8, 2007.  On that date, Macy's issued a press release entitled "Federated's January Same-Store Sales up 8.6% - Company Raises Earnings Guidance for Fiscal 2006 Fourth Quarter."  The release stated in relevant part:

> The company increased its guidance for earnings from continuing operations for the fourth quarter of fiscal 2006.  Excluding merger integration costs and related inventory valuation adjustments, the company now expects fourth quarter earnings from continuing operations of $1.55 to $1.60 per share, compared with previous guidance of $1.40 to $1.50 per share.  The revised guidance includes a one-time gain of 6 cents per share related to completion of its debt tender offer, as announced in December 2006.

> **"January represented a strong finish to our fiscal year, with an outstanding performance in legacy Macy's and Bloomingdale's stores, as well as continued improvement in sales trends at former May Company locations," said Terry J. Lundgren, Federated's chairman, president and chief executive officer.** "Sales were stimulated in part by redemption of gift cards sold during the holiday season and the arrival of cold weather in much of the country."

> "All in all, 2006 was a great year in which we transformed our company and embraced an extraordinary amount of positive change while exceeding our initial earnings targets," Lundgren said.  **"This is a testament to the strategy we have put in place and to the strength of our organization.  We look forward to this momentum carrying into 2007."**

> **Federated expects same-store sales to increase by 2 percent to 3 percent in February.  Beginning in February, Federated's same-store sales will include former May Company locations, as well as legacy Macy's and Bloomingdale's stores, that have been open for more than one full fiscal year.** [Emphasis added.]

26.    The statements referenced above in ¶25 were each materially false and misleading because they positively described the performance at the former May company locations but failed to disclose that the Company's re-branding of the former May stores was being rejected by customers and that sales at former May store locations were declining from historic levels and would continue to do so.

27.     On February 27, 2007, Macy's issued a press release entitled "Federated Reports Fourth Quarter Earnings of $1.45 Per Diluted Share from Continuing Operations; Diluted EPS From Continuing Operations, Excluding Merger Integration Costs and Inventory Valuation Adjustments, is $1.66 - Exceeding the Company's Guidance." The release stated in relevant part:

> Federated Department Stores, Inc. today reported diluted earnings per share from continuing operations of $1.45 for the 14-week fourth quarter of 2006, ended Feb. 3, 2007. This compares with diluted earnings per share from continuing operations of $1.22 for the 13-week period ended Jan. 28, 2006.
>
> Excluding May Company merger integration costs and related inventory valuation adjustments of $177 million ($110 million after tax or 21 cents per diluted share), fourth quarter diluted earnings per share from continuing operations were $1.66. **This exceeds the company's prior guidance, provided on Feb. 8, 2007, for earnings of $1.55 to $1.60 per share excluding merger integration costs and related inventory valuation adjustments.** Earnings for the 2006 fourth quarter include a gain of approximately $54 million ($34 million after tax or 6 cents per diluted share) related to completion of the company's debt tender offer, as previously announced. [Emphasis added.]

28.     During a conference call on February 27, 2007, with financial analysts discussing Macy's fourth quarter 2006 sales results, Hoguet noted "that the trend in [former May stores] has improved." Prompted by analysts' questions, Hoguet also stated that the trend was continuing through February, the first month of the Macy's fiscal year 2007. A transcript of the call published by *Fair Disclosure Wire*, stated in pertinent part:

> [ANALYST]: Just to follow up on the former May doors. Can you give us some color on the degree of improvement as you proceeded through the fourth quarter? And is it possible to give us some measure, whether it's relative to plan or relative to last year, just a sense of how much they have improved and what you think --?
>
> KAREN HOGUET: Let's just say they have improved enough that **we're comfortable with the guidance we're giving you for the first quarter**.
>
> [ANALYST]: Okay. And the biggest drivers for the improvement, was it home or execution?
>
> KAREN HOGUET: It was across the board. That's why I said earlier I really do think it's time that elapsed and given customers and associates time to get used to the change.

- 11 -

\*        \*        \*

[QUESTION]: You had mentioned that the comp trend at the May Company doors has been improving since mid December. Does that include February month to date? If it does, is the rate of improvement in February consistent with what you've seen in January as you transition from more full-priced sales?

KAREN HOGUET: **It does include February** but I'm not going to say a lot about February sales until next week.

MICHELLE CLARK: Okay, so it does include February. [Emphasis added.]

29.     The statements referenced above in ¶¶27-28 were materially false and misleading for the reasons set forth in ¶26 above. In addition, the statement referenced above that "it does include February" was materially false and misleading because as Defendant Hoguet has now admitted, sales at the former May stores were weak in February and March and, therefore, it was materially misleading to represent that comp trends were improving.

30.     On March 8, 2007, Macy's issued a press release entitled "Federated's February Same-Store Sales Up 1.2%." The release stated in relevant part:

Federated Department Stores, Inc. today reported total sales of $1.802 billion for the four weeks ended March 3, 2007, essentially flat compared to total sales of $1.800 billion in the same period last year. On a same-store basis, Federated's sales for February were up 1.2 percent. This compares with the company's guidance for a same-store sales increase of 2 percent to 3 percent in February.

**"Sales in February were impacted by a series of snow and ice storms in the eastern half of the U.S., including those during the important selling days immediately preceding Valentine's Day. The geographic region that was most affected by adverse weather was the Upper Midwest," said Terry J. Lundgren, Federated's chairman, president and chief executive officer. "Aside from the weather, we were pleased with performance of both the new and legacy Macy's stores."**

**Federated expects same-store sales in both March and April to increase by 2.5 percent to 4 percent.**

Beginning in February and now ongoing, Federated's same-store sales include former May Company locations, as well as legacy Macy's and Bloomingdale's stores, that have been open for more than one full fiscal year. [Emphasis added.]

- 12 -

31.     The statements referenced above in ¶30 were materially false and misleading for the reasons set forth in ¶26.  In addition, given the declining results from the former May stores, Defendants lacked a reasonable basis for their statement that they expect "same-store sales in both March and April to increase by 2.5 percent to 4 percent."

32.     On April 12, 2007, the Company issued a press release entitled "Federated's March Same-Store Sales up 2.3%."  The release stated in relevant part:

> Federated Department Stores, Inc. today reported total sales of $2.288 billion for the five weeks ended April 7, 2007, an increase of 1.5 percent compared to total sales of $2.255 billion in the same period last year.  On a same-store basis, Federated's sales for March were up 2.3 percent.  This compares with the company's guidance for a same-store sales increase of 2.5 percent to 4 percent in March.
>
> For the year to date, Federated's sales totaled $4.089 billion, up 0.8 percent from total sales of $4.055 billion in the first nine weeks of 2006.  On a same-store basis, Federated's year-to-date sales were up 1.8 percent.
>
> **"March sales fell just short of our expectations in most regions across the country, largely attributable to weakness in home-related merchandise categories," said Terry J. Lundgren, Federated's chairman, president and chief executive officer.  "Unseasonably cold weather as new spring merchandise flowed into the stores in the pre-Easter period also contributed to disappointing sales in the month."**
>
> **Federated continues to expect same-store sales in April to increase by 2.5 percent to 4 percent.  Sales in the first quarter are expected to be at the low end of previous guidance of $6 billion to $6.1 billion.**  [Emphasis added.]

33.     The statements referenced above in ¶32 were materially false and misleading for the reasons set forth above in ¶26.

34.     On May 10, 2007, Defendants shocked the market by revealing first that the Company's April same-store sales were down 2.2%.  Lundgren stated that "April sales were disappointing across the country in both new and legacy Macy's stores" and that a "major promotional event that was shifted from May last year to April this year did not produce the results we expected."  The Company's release also stated that the Company expected same-store sales in

- 13 -

May 2007 "to be in the range of flat to down 2 percent, which reflects the promotional event shift from May into April."

35.    In response to this announcement, the price of Macy's stock declined from $43.48 per share to $41.78 per share on extremely heavy trading volume.

36.    Then, on May 16, 2007, before the market opened, the Company issued a press release entitled "Federated Reports First Quarter Earnings of 11 Cents Per Diluted Share from Continuing Operations, up from a Loss of 13 Cents Per Diluted Share Last Year; Diluted EPS is 16 Cents, Excluding Merger Integration Costs." The release quoted Lungren as stating that "**sales in the new Macy's locations were disappointing in the quarter,"** (emphasis added) and stated in relevant part:

> Federated's guidance is for total sales of $6.0 billion to $6.1 billion in the second quarter, compared with previous guidance of $6.1 billion to $6.2 billion. On a same-store basis, the company expects second quarter sales to be flat to up 2 percent, versus prior guidance of up 1.5 percent to 2.5 percent. Earnings per diluted share, excluding merger integration costs, are now expected to be in the range of 35 to 45 cents, compared with previous guidance of 40 to 45 cents, in the second quarter. The revised second quarter guidance reflects management's concern about uncertainty in the economic environment.

37.    During a conference call with financial analysts, on May 16, 2007, Hoguet directly contradicted Defendants' previous representations that February 2007 sales at former May stores had continued to improve over fourth quarter of 2006 sales results. A transcript of the call published by *Fair Disclosure Wire* stated in pertinent part as follows:

> In February and March, our comp-store sales were only slightly lower than what we had expected. However, in April, the gap to our expectations was wider. Also, **in February and March, the weakness was focused on the new Macy's or the former May doors**, and the Home business, particularly furniture. However, in April, the weakness was more widespread and included apparel areas in both the former May as well as the legacy Macy doors. It is hard to say how much of the April weakness in apparel was due to weather, but clearly it was a factor. In early May, apparel sales have rebounded somewhat, but we need more time to judge the underlying trend. [Emphasis added.]

- 14 -

Defendants further revealed that customers of the former May stores had rejected the rapid conversion, that sales at the Company's new Macy's stores had declined during the first quarter of 2007, and that, in particular, the Company's decision to dramatically cut the number of days coupons that could be used at the former May locations had badly damaged sales. "'By cutting back as hard as we did, we clearly hurt the business,'" Defendant Hoguet stated on May 14, 2007.

38.     First quarter 2007 revenue significantly missed the Company's earlier forecast of $6.1 billion, coming in 2% lower at $5.92 billion. Sales at stores open at least a year rose only 0.6%, missing the Company's guidance of a 2.5% to 3.5% gain. Meanwhile, same-store sales rose 2.2% at J.C. Penney, 4.3% at Target and 9.5% at Nordstroms. The Company lowered its second quarter of 2007 sales forecast from $6.2 to $6.1 billion and its profit forecast from $0.40-$0.45 per share to $0.35-$0.45 per share.

39.     In response to their announcements, the price of Macy's common stock declined from $40.00 per share to $38.76 per share on extremely heaving trading volume.

40.     On September 30, 2007 an article published by the *New York Times News Service* included comments by Defendant Lundgren in which he publicly acknowledged that the abrupt curtailment of discount coupons was Macy's biggest misstep leading to declining sales during the first four months of fiscal 2007. The article stated in pertinent part as follows:

> It was the boldest stroke in American retailing in decades. The Macy's chain completed its takeover of 410 department stores around the country a year ago and renamed them all Macy's, vowing to lure shoppers with innovations like price scanners in the aisles and exclusive fashions from the likes of Oscar de la Renta.
>
> So far, the grand plan is not working.
>
> A big reason? Macy's forgot a basic law of human nature: Shoppers love a deal.
>
> For years, the department stores that Macy's acquired, like Marshall Field's and Filene's, had relied on 15- and 20-percent-off coupons to alert people, like a Pavlovian bell, that it was time to shop. As part of its reinvention, Macy's tried to wean shoppers off them.

But the tactic backfired.  With fewer coupons to clip, thousands of people from Washington to Los Angeles turned their backs on Macy's.

Now the company's chief executive, Terry J. Lundgren, one of the brightest stars in American retailing, is pleading mea culpa -- and backtracking.  Macy's pledges to issue plenty of coupons for the holiday shopping season

It's a lesson that other companies have also learned the hard way.  Since the first coupon was issued for the Coca-Cola Company in 1894, companies have occasionally tried to take them away -- and suffered.  Cuts by the Ruby Tuesday chain in 2004 hurt sales. Procter & Gamble's effort in 1996 led to boycotts.

Even in this era of Internet shopping, it seems, Americans are wedded to a low-tech form of marketing: the dotted-line clip-out coupon.

For years, Karen Gundling, 41, a communications consultant in Parma, Ohio, relied on 20-percent-off coupons from Kaufmann's in Cleveland to buy shoes.  Then Macy's took over.  ''Now that Macy's doesn't do coupons, I don't buy shoes there,'' Ms. Gundling said.

Curbing coupons was not the only change that upset shoppers.

In 2005, Macy's, then known as Federated Department Stores, acquired May Department Stores, which owned 11 storied chains around the country, like Foley's in Houston and Robinsons-May in Los Angeles.  Last year, Macy's changed all the store names, a move that upset loyal shoppers.  Mr. Lundgren said the new chain, with 800 stores and $27 billion in sales, would be big enough to secure exclusive product lines from big names -- as it did, with Elie Tahari and Martha Stewart -- then blanket the country with advertisements to let shoppers know about it.  To complete the makeover, Macy's reduced its reliance on midprice clothing brands like Levi's and Dockers.

Mr. Lundgren tried to create a new kind of national department store that would no longer compete head-to-head with lower-priced competitors like J. C. Penney and Kohl's.  But the changes amounted to ''too much, too fast,'' Mr. Lundgren acknowledged in an interview. It turns out that men, in particular, are creatures of shopping habit.  They want to go to the local department store and find the Dockers where they have always been.

Mr. Lundgren said that abruptly curtailing discounts like coupons was Macy's biggest misstep, contributing to four consecutive months of falling store sales this spring.  Macy's stock has dropped more than 40 percent since it bought the May stores.  Mr. Lundgren said his plan ''will take longer than we had planned or expected,'' adding that ''the strategy is crystal clear, and I know we are on the right track.''

Despite their dowdy image, coupons remain a huge business. In 2006, companies issued 279 billion of them, or roughly 1,000 per person, up 13 percent in four years, according to NCH Marketing Services in Deerfield, Ill.

They remain, above all, a psychological tool, granting shoppers the seemingly illicit -- and gratifying -- right to snag a bargain. (Never mind that stores typically set prices high and budget for the ''discounts.'')

''If you have ever watched a person at a cash register with a handful of coupons, you can see they are so proud,'' said Jan S. Slater, a professor of advertising at the University of Illinois. ''They love taking their coupons out, counting them, showing them off, watching as the tab on the cash register falls.''

But retailers dislike coupons, which train shoppers to wait for deep discounts, making it harder to sell full-price merchandise. Moreover, Mr. Lundgren said, ''in our research, customers told us, 'It's complicated and confusing and I don't what the exact price is.'''

So Macy's, which still sends coupons by mail to loyal charge card users, said it issued about 30 percent fewer coupons for the general public at the former May stores in spring 2007 than in the previous spring.

An analysis by a professor at Stetson University College of Law in Florida, Mark D. Bauer, suggests the pullback may have been more extensive; he counted a 63 percent drop in Washington, at the former Hecht's chain, and 59 percent in Cleveland, at the former Kaufmann's.

Macy's had reason to think it could pull off the cuts. Before the merger, it had trimmed coupons at its own stores by about 25 percent. But that reduction was gradual, taking five years. After the sudden cuts at former May stores, customers did not congratulate the chain for simplifying their shopping; they groused about seemingly higher prices.

Nancy Lauffenberger, 39, a medical administrator outside Chicago, said she counted on the 20-percent-off coupons from Marshall Field's, which allowed her, a working mother, to splurge on luxuries like a $625 leather coat.

''For me, it was a very expensive coat,'' she said, ''but with the coupon, it was a great price.'' These days, Ms. Lauffenberger shops more at stores like Kohl's.

Macy's tried to head off the problem. In Chicago, sales clerks explained to customers that they would save more using their new Macy's charge cards, which can be programmed for discounts. ''The shoppers didn't believe it,'' said Frank J. Guzzetta, who runs the former Marshall Field's stores. ''They wanted their coupons back.''

So Macy's is dropping plans for deeper coupon cuts this fall, though executives will still hand out fewer than chains like Marshall Field's did before the merger. And

Macy's is undoing some other changes -- ordering more Levi's and Dockers, for instance.

Lisa Ellis, 41, a bank employee in Euclid, Ohio, said she largely gave up on Macy's after it bought Kaufmann's. ''But if Macy's used more coupons,'' she said, ''I'd go back.''

### Additional Scienter Allegations

41.     The Individual Defendants directly participated in the management of Macy's, were directly involved in the day-to-day operations of Macy's at the highest levels and were privy to confidential proprietary information concerning Macy's and its business, operations, products, growth, financial statements and financial condition and were aware of or deliberately disregarded that the false and misleading statements made by and regarding the Company were in the market and causing the Company's stock to trade at inflated prices.  Because of their managerial positions with Macy's, each had access to the adverse undisclosed information about Macy's business, financial condition and prospects and knew (or deliberately disregarded) that the adverse facts alleged herein rendered the positive representations made during the Class Period materially false and misleading.

42.     Each Individual Defendant was personally familiar with the quality of the Company's projected earnings and the deleterious effect the rapid conversion of merchandise and elimination of promotional sales efforts was having at the former May stores because they monitored Macy's revenues and were closely monitoring the performance of Macy's operations via reports from Macy's finance department, which were generated and provided to them on a regular basis.  The reports summarized the Company's sales practices, inventory levels and promotional sales results.  As a result of their monitoring, each of the Individual Defendants was aware that Macy's would be unable to meet its own projected sales targets and financial results.

43.     During the Class Period, the Individual Defendants and each member of Macy's senior management staff collectively sold $51,425,639 worth of their personally-held Macy's

common stock to the unsuspecting public while in the possession of material adverse facts concerning the failed integration of former May stores under a national Macy's brand and the alleged scheme to misrepresent Macy's ability to achieve first quarter of 2007 sales targets, as detailed herein.

44.    Defendants' insider sales were unusual and suspicious in timing and amount for the following reasons among others:

(a)    as set forth in the chart below, the Individual Defendants sold a high percentage of the Macy's shares they directly or beneficially owned during the Class Period. Specifically, Defendant Lundgren sold 57% of his personally-held Macy's common stock during the Class Period. Similarly, Defendant Hoguet sold 47% of her personally-held Macy's common stock. Moreover, these individuals did not sell any shares of Macy's common stock during the previous twelve months;

(b)    the sales by the Individual Defendants and other Macy's insiders commenced on March 2, 2007, 3 days after the Company's February 27, 2007 repurchase of 45 million shares of its common stock. Thus, while Defendant Hoguet publicly represented during a fourth quarter of 2006 earnings conference call that the repurchase represented a "great investment" for the Company presumably because of the stock's purported undervaluation by the market, insiders were planning to sell, and succeeded in selling, more than 1.1 million shares at prices artificially inflated by Defendants' repeated misrepresentations that positive sales trends reported for fourth quarter of 2006 were continuing through first quarter of 2007; and

(c)    the massive sales by Macy's insiders, beginning on March 2, 2007, continued unabated through April 18, 2007, just 22 days prior to Macy's devastating May 10, 2007 announcement that April 2007 comp-store sales had in fact declined. All of the insider transactions

identified in the chart below were executed in a price range of $44.00(+) per share to $46.00(+) per

share, at or near the Class Period high of $46.70 per share reached on March 23, 2007.  Defendant

Lundgren's sales of 279,420 shares were particularly prescient, having been executed on March 22,

2007 for prices ranging from $46.00 per share to $46.37 per share.

      45.    The following chart details the sales by the Individual Defendants which totaled more

than $51.4 million during the Class Period:

| Last Name | First Name | Title | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|---|
| BELSKY | JOEL | VP Controller | 3/21/2007 | 10,000 | $46.15 | $461,500 |
|  |  |  |  | 10,000 |  | $461,500 |
|  |  |  |  |  |  |  |
| BRODERICK | DENNIS | SVP General Counsel | 3/2/2007 | 24,000 | $44.29 | $1,062,960 |
|  |  |  | 3/2/2007 | 4,600 | $44.28 | $203,688 |
|  |  |  | 3/27/2007 | 11,400 | $46.25 | $527,250 |
|  |  |  | 3/27/2007 | 10,000 | $46.23 | $462,300 |
|  |  |  | 3/27/2007 | 4,400 | $46.24 | $203,456 |
|  |  |  | 3/27/2007 | 4,200 | $46.26 | $194,292 |
|  |  |  | 3/27/2007 | 2,600 | $46.30 | $120,380 |
|  |  |  | 3/27/2007 | 1,400 | $46.29 | $64,806 |
|  |  |  | 3/27/2007 | 1,200 | $46.33 | $55,596 |
|  |  |  | 3/30/2007 | 4,600 | $45.50 | $209,300 |
|  |  |  |  | 68,400 |  | $3,104,028 |
|  |  |  |  |  |  |  |
| CODY | THOMAS | Vice Chair | 3/2/2007 | 120,000 | $44.42 | $5,330,400 |
|  |  |  | 3/29/2007 | 10,800 | $45.10 | $487,080 |
|  |  |  | 3/29/2007 | 8,400 | $45.12 | $379,008 |
|  |  |  | 3/29/2007 | 5,800 | $45.15 | $261,870 |
|  |  |  | 3/29/2007 | 5,100 | $45.06 | $229,806 |
|  |  |  | 3/29/2007 | 4,300 | $45.05 | $193,715 |
|  |  |  | 3/29/2007 | 3,900 | $45.03 | $175,617 |
|  |  |  | 3/29/2007 | 3,200 | $45.02 | $144,064 |
|  |  |  | 3/29/2007 | 3,100 | $44.90 | $139,190 |
|  |  |  | 3/29/2007 | 2,500 | $45.11 | $112,775 |
|  |  |  | 3/29/2007 | 2,100 | $44.94 | $94,374 |
|  |  |  | 3/29/2007 | 2,100 | $45.01 | $94,521 |
|  |  |  | 3/29/2007 | 2,100 | $45.04 | $94,584 |
|  |  |  | 3/29/2007 | 1,900 | $44.95 | $85,405 |
|  |  |  | 3/29/2007 | 1,700 | $45.13 | $76,721 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | 3/29/2007 | 1,200 | $45.16 | $54,192 |
| | | | 3/29/2007 | 1,000 | $44.96 | $44,960 |
| | | | 3/29/2007 | 1,000 | $44.97 | $44,970 |
| | | | 3/29/2007 | 1,000 | $44.99 | $44,990 |
| | | | 3/29/2007 | 1,000 | $45.00 | $45,000 |
| | | | 3/29/2007 | 900 | $44.89 | $40,401 |
| | | | 3/29/2007 | 700 | $44.92 | $31,444 |
| | | | 3/29/2007 | 600 | $45.14 | $27,084 |
| | | | 3/29/2007 | 300 | $44.91 | $13,473 |
| | | | 3/29/2007 | 300 | $45.07 | $13,521 |
| | | | | 185,000 | | $8,259,165 |
| | | | | | | |
| COLE | THOMAS | Vice Chair | 3/26/2007 | 36,400 | $46.33 | $1,686,412 |
| | | | 3/26/2007 | 17,100 | $46.36 | $792,756 |
| | | | 3/26/2007 | 14,400 | $46.32 | $667,008 |
| | | | 3/26/2007 | 13,800 | $46.30 | $638,940 |
| | | | 3/26/2007 | 13,600 | $46.35 | $630,360 |
| | | | 3/26/2007 | 12,300 | $46.34 | $569,982 |
| | | | 3/26/2007 | 11,600 | $46.31 | $537,196 |
| | | | 3/26/2007 | 5,800 | $46.43 | $269,294 |
| | | | 3/26/2007 | 3,700 | $46.41 | $171,717 |
| | | | 3/26/2007 | 2,500 | $46.42 | $116,050 |
| | | | 3/26/2007 | 2,100 | $46.37 | $97,377 |
| | | | 3/26/2007 | 2,000 | $46.40 | $92,800 |
| | | | 3/26/2007 | 2,000 | $46.48 | $92,960 |
| | | | 3/26/2007 | 1,900 | $46.45 | $88,255 |
| | | | 3/26/2007 | 1,600 | $46.47 | $74,352 |
| | | | 3/26/2007 | 1,500 | $46.46 | $69,690 |
| | | | 3/26/2007 | 1,000 | $46.39 | $46,390 |
| | | | 3/26/2007 | 700 | $46.38 | $32,466 |
| | | | 3/28/2007 | 7,100 | $45.70 | $324,470 |
| | | | 3/28/2007 | 6,400 | $45.75 | $292,800 |
| | | | 3/28/2007 | 5,200 | $45.76 | $237,952 |
| | | | 3/28/2007 | 2,300 | $45.71 | $105,133 |
| | | | 3/28/2007 | 1,900 | $45.74 | $86,906 |
| | | | 3/28/2007 | 1,500 | $45.86 | $68,790 |
| | | | 3/28/2007 | 1,400 | $45.72 | $64,008 |
| | | | 3/28/2007 | 1,300 | $45.80 | $59,540 |
| | | | 3/28/2007 | 1,000 | $45.64 | $45,640 |
| | | | 3/28/2007 | 900 | $45.69 | $41,121 |
| | | | 3/28/2007 | 900 | $45.73 | $41,157 |
| | | | 3/28/2007 | 800 | $45.81 | $36,648 |
| | | | 3/28/2007 | 700 | $45.82 | $32,074 |
| | | | 3/28/2007 | 500 | $45.78 | $22,890 |
| | | | 3/28/2007 | 500 | $45.79 | $22,895 |
| | | | 3/28/2007 | 100 | $45.77 | $4,577 |

|  |  |  |  | 176,500 |  | $8,160,606 |
|---|---|---|---|---|---|---|
| GROVE | JANET | Vice Chair | 3/2/2007 | 42,000 | $44.31 | $1,861,020 |
|  |  |  | 3/2/2007 | 30,000 | $44.31 | $1,329,300 |
|  |  |  | 4/17/2007 | 15,800 | $45.32 | $716,056 |
|  |  |  | 4/17/2007 | 14,700 | $45.34 | $666,498 |
|  |  |  | 4/17/2007 | 12,700 | $45.37 | $576,199 |
|  |  |  | 4/17/2007 | 12,500 | $45.33 | $566,625 |
|  |  |  | 4/17/2007 | 10,200 | $45.35 | $462,570 |
|  |  |  | 4/17/2007 | 8,900 | $45.23 | $402,547 |
|  |  |  | 4/17/2007 | 6,100 | $45.29 | $276,269 |
|  |  |  | 4/17/2007 | 5,500 | $45.36 | $249,480 |
|  |  |  | 4/17/2007 | 4,500 | $45.15 | $203,175 |
|  |  |  | 4/17/2007 | 4,300 | $45.30 | $194,790 |
|  |  |  | 4/17/2007 | 4,200 | $45.22 | $189,924 |
|  |  |  | 4/17/2007 | 3,600 | $45.38 | $163,368 |
|  |  |  | 4/17/2007 | 3,500 | $45.24 | $158,340 |
|  |  |  | 4/17/2007 | 3,500 | $45.40 | $158,900 |
|  |  |  | 4/17/2007 | 3,200 | $45.31 | $144,992 |
|  |  |  | 4/17/2007 | 3,100 | $45.27 | $140,337 |
|  |  |  | 4/17/2007 | 3,000 | $45.14 | $135,420 |
|  |  |  | 4/17/2007 | 2,900 | $45.20 | $131,080 |
|  |  |  | 4/17/2007 | 2,500 | $45.21 | $113,025 |
|  |  |  | 4/17/2007 | 1,900 | $45.28 | $86,032 |
|  |  |  | 4/17/2007 | 1,500 | $45.16 | $67,740 |
|  |  |  | 4/17/2007 | 1,000 | $45.19 | $45,190 |
|  |  |  | 4/17/2007 | 600 | $45.39 | $27,234 |
|  |  |  | 4/17/2007 | 300 | $45.26 | $13,578 |
|  |  |  | 4/18/2007 | 523 | $44.95 | $23,509 |
|  |  |  |  | 202,523 |  | $9,103,198 |
| HOGUET | KAREN | CFO | 3/2/2007 | 84,000 | $44.37 | $3,727,080 |
|  |  |  |  | 84,000 |  | $3,727,080 |
| KRONICK | SUSAN | Vice Chair | 3/9/2007 | 53,800 | $44.50 | $2,394,100 |
|  |  |  | 3/12/2007 | 60,700 | $44.50 | $2,701,150 |
|  |  |  |  | 114,500 |  | $5,095,250 |
| LEVINSON | SARA |  | 3/21/2007 | 3,500 | $45.80 | $160,300 |
|  |  |  | 4/9/2007 | 3,500 | $46.01 | $161,035 |
|  |  |  |  | 7,000 |  | $321,335 |
| LUNDGREN | TERRY | CEO, President | 3/22/2007 | 37,300 | $46.01 | $1,716,173 |
|  |  |  | 3/22/2007 | 23,200 | $46.05 | $1,068,360 |
|  |  |  | 3/22/2007 | 22,600 | $46.00 | $1,039,600 |

| | | | | |
|---|---|---|---|---|
| | 3/22/2007 | 12,100 | $46.11 | $557,931 |
| | 3/22/2007 | 11,200 | $46.07 | $515,984 |
| | 3/22/2007 | 10,200 | $46.15 | $470,730 |
| | 3/22/2007 | 9,400 | $46.36 | $435,784 |
| | 3/22/2007 | 9,200 | $46.20 | $425,040 |
| | 3/22/2007 | 8,700 | $46.30 | $402,810 |
| | 3/22/2007 | 8,400 | $46.10 | $387,240 |
| | 3/22/2007 | 8,400 | $46.14 | $387,576 |
| | 3/22/2007 | 7,300 | $46.06 | $336,238 |
| | 3/22/2007 | 7,000 | $46.22 | $323,540 |
| | 3/22/2007 | 6,820 | $46.05 | $314,061 |
| | 3/22/2007 | 6,600 | $46.09 | $304,194 |
| | 3/22/2007 | 6,100 | $46.04 | $280,844 |
| | 3/22/2007 | 6,000 | $46.13 | $276,780 |
| | 3/22/2007 | 5,700 | $46.12 | $262,884 |
| | 3/22/2007 | 5,600 | $46.07 | $257,992 |
| | 3/22/2007 | 5,400 | $46.08 | $248,832 |
| | 3/22/2007 | 5,000 | $46.00 | $230,000 |
| | 3/22/2007 | 4,600 | $46.02 | $211,692 |
| | 3/22/2007 | 4,600 | $46.06 | $211,876 |
| | 3/22/2007 | 4,400 | $46.10 | $202,840 |
| | 3/22/2007 | 4,300 | $46.16 | $198,488 |
| | 3/22/2007 | 4,100 | $46.31 | $189,871 |
| | 3/22/2007 | 3,800 | $46.18 | $175,484 |
| | 3/22/2007 | 3,800 | $46.21 | $175,598 |
| | 3/22/2007 | 3,100 | $46.01 | $142,631 |
| | 3/22/2007 | 2,600 | $46.04 | $119,704 |
| | 3/22/2007 | 2,400 | $46.32 | $111,168 |
| | 3/22/2007 | 2,200 | $46.03 | $101,266 |
| | 3/22/2007 | 2,100 | $46.03 | $96,663 |
| | 3/22/2007 | 2,100 | $46.37 | $97,377 |
| | 3/22/2007 | 1,900 | $46.34 | $88,046 |
| | 3/22/2007 | 1,800 | $46.26 | $83,268 |
| | 3/22/2007 | 1,400 | $46.11 | $64,554 |
| | 3/22/2007 | 1,300 | $46.33 | $60,229 |
| | 3/22/2007 | 1,300 | $46.35 | $60,255 |
| | 3/22/2007 | 1,200 | $46.17 | $55,404 |
| | 3/22/2007 | 1,200 | $46.25 | $55,500 |
| | 3/22/2007 | 1,000 | $46.24 | $46,240 |
| | 3/22/2007 | 900 | $46.23 | $41,607 |
| | 3/22/2007 | 800 | $46.12 | $36,896 |
| | 3/22/2007 | 200 | $46.13 | $9,226 |
| | 3/22/2007 | 100 | $46.08 | $4,608 |
| | | 279,420 | | $12,883,084 |
| WEATHERUP | CRAIG | 3/15/2007 | 2,000 | $44.30 | $88,600 |

| | | | |
|---|---|---|---|
| 3/15/2007 | 2,000 | $44.38 | $88,760 |
| 3/15/2007 | 1,700 | $44.32 | $75,344 |
| 3/15/2007 | 1,000 | $44.39 | $44,390 |
| 3/15/2007 | 300 | $44.33 | $13,299 |
| | 7,000 | | $310,393 |

**Total:**    **1,134,343**    **$51,425,639**

## Class Action Allegations

46.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Macy's (then known as Federated) publicly traded securities during the Class Period (the "Class"). Excluded from the Class are Defendants, directors and officers of Macy's and their families and affiliates.

47.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. During the Class Period, Macy's had over 454 million shares of stock outstanding, owned by thousands of persons.

48.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the Exchange Act was violated by Defendants;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)    The extent of damage sustained by Class members and the appropriate measure of damages.

**Loss Causation/Economic Harm**

49.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Macy's stock price and operated as a fraud or deceit on Class Period purchasers of Macy's stock by misrepresenting the Company's business success and future business prospects. When Defendants' falsehoods, misrepresentations and omissions were disclosed and became apparent, Macy's stock price fell precipitously as some of the prior artificial inflation came out of the stock. As a result of their purchases of Macy's stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

50.    Defendants' false and misleading statements and omissions had the intended effect and caused Macy's stock to trade at artificially inflated levels throughout the Class Period, reaching a Class Period high of $46.70 per share on March 23, 2007, before collapsing below $40 per share on May 16, 2007 – an 18% decline.

51.    The 18% decline in Macy's stock price at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud being revealed to investors and the market. The timing and magnitude of Macy's stock price declines negate any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. During the same period in which Macy's stock price fell 18% as a result of Defendants' fraud being revealed, the Standard & Poor's 500 securities index was essentially flat. The economic loss, *i.e.*, damages, suffered by Plaintiff and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate Macy's stock price and the subsequent significant decline in

the value of Macy's stock when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

52.     Plaintiff incorporates ¶¶1-51 by reference.

53.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

54.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Macy's publicly traded securities during the Class Period.

55.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Macy's publicly traded securities.  Plaintiff and the Class would not have purchased Macy's publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

56.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Macy's publicly traded securities during the Class Period.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### Against All Defendants

57.    Plaintiff incorporates ¶¶1-56 by reference.

58.    The Individual Defendants acted as controlling persons of Macy's within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions as officers and/or directors of Macy's, and their ownership of Macy's stock, the Individual Defendants had the power and authority to cause Macy's to engage in the wrongful conduct complained of herein.  Macy's controlled the Individual Defendants and all of its employees.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

A.    Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding Plaintiff and other members of the Class damages together with interest thereon;

C.    Awarding Plaintiff and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D.    Awarding Plaintiff and other members of the Class such equitable/injunctive or other and further relief as may be just and proper under the circumstances.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  November 19, 2007

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
RUSSELL J. GUNYAN

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
MARY K. BLASY
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2007, a copy of the foregoing Consolidated

Amended Complaint for Violation of the Federal Securities Laws was sent, via U.S. Mail,

postage prepaid to the following parties on the attached service list.


Samuel H. Rudman

MACY'S FEDERATED
Service List - 9/11/2007    (07-0126)
Page 1 of 1

**Counsel For Defendant(s)**

Arthur J. Margulies
Jones Day
222 East 41st Street
New York, NY 10017
   212/326-3939
   212/755-7306(Fax)

John M. Newman, Jr.
Michael A. Platt
Geoffrey J. Ritts
Jones Day
901 Lakeside Avenue, North Point
Cleveland, OH 44114
   216/586-3939
   216/579-0212(Fax)

**Counsel For Plaintiff(s)**

Samuel H. Rudman
David A. Rosenfeld
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY 11747
   631/367-7100
   631/367-1173(Fax)

Darren J. Robbins
Mary K. Blasy
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
   619/231-1058
   619/231-7423(Fax)

Alfred G. Yates
Law Offices of Alfred G. Yates, Jr., P.C.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
   412/391-5164
   412/471-1033(Fax)

Brian P. Murray
Bradley P. Dyer
Murray, Frank & Sailer LLP
275 Madison Avenue, Suite 801
New York, NY 10016
   212/682-1818
   212/682-1892(Fax)

Richard A. Maniskas
D. Seamus Kaskela
Schiffrin Barroway Topaz & Kessler, LLP
280 King of Prussia Road
Radnor, PA 19087
   610/667-7706
   610/667-7056(Fax)