**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x

In re MACY'S, INC. SECURITIES :
      LITIGATION                     :      Master File No. 1:07-cv-04774-AKH
                                       :
                                       :      ECF
                                       :

      This document relates to:      :

      ALL ACTIONS.                :
                                       :
                                     :
                                     :

---------------------------------------------------------- x

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION**
**TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ................................................................................................................... 2

    A.    The Parties ................................................................................................... 2

    B.    Macy's Acquisition of May ........................................................................ 4

    C.    Macy's Alleged Misstatements .................................................................. 5

    D.    Macy's Alleged "Corrective" Disclosures ................................................ 6

ARGUMENT ....................................................................................................................... 8

    I.    The Section 10(b) Claim Should Be Dismissed Because the Complaint
        Fails to Allege With Particularity Any Material Misstatement ................................. 8

        A.    The Complaint's Allegations of Fraud Are Based Entirely On
            Hindsight ........................................................................................... 9

        B.    The Complaint's Claims of Misstatements Are Belied By a
            Review of Defendants' Actual Statements ................................... 13

    II.    The Section 10(b) Claim Should Be Dismissed Because the Complaint
        Fails to Allege Scienter ........................................................................................ 17

        A.    The Complaint Fails to Raise a Strong Inference of Conscious
            Misbehavior or Recklessness ........................................................ 18

        B.    Allegations Regarding Insider Sales Do Not Raise a Strong
            Inference of Scienter ..................................................................... 21

    III.    The Alleged Misstatements Are Forward-Looking Statements
        Protected By the PSLRA Safe Harbor and the Common-Law Doctrine
        of "Bespeaks Caution" ........................................................................................ 27

    IV.    Plaintiff's "Control Person" Claims Should Be Dismissed ....................................... 31

CONCLUSION ................................................................................................................... 32

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*Acito v. IMCERA Group, Inc.*,
   47 F.3d 47 (2d Cir. 1995) ............................................................. 22, 24

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ............................................................ 9, 17

*Brown v. Hutton Group*,
   795 F. Supp. 1317, 1324 (S.D.N.Y. 1992),
   *aff'd*, 991 F.2d 1020 (2d Cir. 1993) .................................................. 31

*Caiafa v. Sea Containers Ltd.*, No. 06 Civ. 2565 (RMB),
   2007 WL 2815633 (S.D.N.Y. Sept. 25, 2007) ................................. 18

*Denny v. Barber*,
   576 F.2d 465 (2d Cir. 1978) ............................................................ 11

*DiLeo v. Ernst & Young*,
   901 F.2d 624 (7th Cir. 1990) ............................................................ 9

*First Nationwide Bank v. Gelt Funding Corp.*,
   27 F.3d 763 (2d Cir. 1994) ............................................................... 8

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000) ........................................................... 2, 8

*Glickman v. Alexander & Alexander Servs., Inc.*, No. 93 Civ. 7594(LAP),
   1996 WL 88570 (S.D.N.Y. Feb. 29, 1996) ...................................... 20

*In re Advanta Corp. Sec. Litig.*,
   180 F.3d 525 (3d Cir. 1999) ............................................................ 24

*In re Alstom SA Sec. Litig.*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005) ........................................... 8, 32

*In re Aegon N.V. Sec. Litig.*, No. 03 Civ. 0603(RWS),
   2004 WL 1415973 (S.D.N.Y. June 23, 2004) ................................. 18

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004) ............................................. 10

## TABLE OF AUTHORITIES

Page(s)

### FEDERAL CASES
(Continued)

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005) ................................................................. 21, 22, 27

*In re Bristol-Myers Squibb Sec. Litig.*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004) ............................................................... 23, 24, 26

*In re Citigroup, Inc. Sec. Litig.*,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004) ........................................................................ 21

*In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478(NRB),
    2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003) ............................................................ 20

*In re eSpeed, Inc. Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006) .................................................................... 22, 24

*In re Global Crossing, Ltd. Sec. Litig.*,
    471 F. Supp. 2d 338 (S.D.N.Y. 2006) ......................................................................... 2

*In re IAC/InterActiveCorp Sec. Litig.*,
    478 F. Supp. 2d 574 (S.D.N.Y. 2007) ............................................................ 9, 28, 30, 31

*In re NTL, Inc. Sec. Litig.*,
    347 F. Supp. 2d 15 (S.D.N.Y. 2004) ...................................................................... 11, 17

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
    423 F. Supp. 2d 364 (S.D.N.Y. 2006) .............................................................. 17, 19, 20

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) ................................................................................. 11

*In re Sierra Wireless, Inc. Sec. Litig.*,
    482 F. Supp. 2d 365 (S.D.N.Y. 2007) ........................................................................ 28

*In re Silicon Graphics Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) ................................................................................ 22

*In re Veeco Instruments, Inc. Sec. Litig.*,
    235 F.R.D. 220 (S.D.N.Y. 2006) ............................................................................. 28

CLI-1579518

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES
### (Continued)

*Kalin v. Xanboo*, 04-CV-5931(KMK),
    2007 WL 273546 (S.D.N.Y. Jan. 31, 2007) ................................................................... 32

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) ................................................................... 13, 17, 18

*Kinsey v. Cendant Corp.*, No. 04 Civ. 0582 (RWS),
    2005 WL 1907678 (S.D.N.Y. Aug. 10, 2005) ................................................................... 19

*Kramer v. Time Warner Inc.*,
    937 F.2d 767 (2d Cir. 1991) ................................................................... 2

*Lapin v. Goldman Sachs Group, Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006) ................................................................... 32

*Malin v. XL Capital Ltd.*,
    499 F. Supp. 2d 117 (D. Conn. 2007) ................................................................... 22, 26, 27

*Mills v. Polar Molecular Corp.*,
    12 F.3d 1170 (2d Cir. 1993) ................................................................... 9

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ................................................................... 11, 17, 18, 21

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
    98 F.3d 2 (2d Cir. 1996) ................................................................... 10, 11

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ................................................................... 21, 24

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000) ................................................................... 2, 24

*San Leandro Emergency Med. Group Profit Sharing
    Plan v. Philip Morris Co., Inc.*,
    75 F.3d 801 (2d Cir. 1996) ................................................................... 19

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994) ................................................................... 11, 31

CLI-1579518

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES
### (Continued)

*Stevelman v. Alias Research Inc.*,
    174 F.3d 79 (2d Cir. 1999) .......................................................... 10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007) ............................................................ 17, 18

*Xerion Partners I LLC v. Resurgence Asset Mgmt., LLC*, 474 F.
    Supp. 2d 505 (S.D.N.Y. 2007) ................................................. 11, 13

## STATUTES and RULES

15 U.S.C. § 78t ............................................................................ 31

15 U.S.C. § 78u-4 ................................................................... 1, 9, 17

15 U.S.C. § 78u-5 ............................................................ 2, 8, 27, 28

Fed. R. Civ. P. 9 ...................................................................... 1, 8, 9

Fed. R. Civ. P. 12 ..................................................................... 8, 17

## MISCELLANEOUS

Private Securities Litigation Reform Act of 1995,
    H.R. No. 104-369 (1995) (Conf. Rep.),
    *reprinted in* 1995 U.S.C.C.A.N. 730 ............................................ 28

James Covert, *Retail-Sales Slide Fuels Concern --- Decline of
    2.3% in April Among Worst on Record; Even Wal-Mart
    Slipped*, Wall St. J., May 11, 2007, at A3 ..................................... 10

Cotten Timberlake, *Macy's Loses Sales as It Weans Shoppers
    From Coupons*, May 16, 2007, Bloomberg Press,
    http://www.bloomberg.com/apps/news?pid=newsarchive&
    sid=aJBh8DpFkD.Y (last visited Jan. 14, 2008) ............................. 7

## PRELIMINARY STATEMENT

This securities fraud lawsuit should be dismissed for failing to satisfy the exacting pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 (the "PSLRA").  In particular, the Consolidated Amended Complaint (the "Complaint"):

- fails to plead false and misleading statements with particularity;

- fails to demonstrate a cogent and compelling inference of defendants' scienter; and

- fails to overcome the PSLRA's safe harbor for forward-looking statements and the bespeaks-caution doctrine.

Commenced just after Macy's announced that it had narrowly missed its first-quarter 2007 sales projections, plaintiff has done little more than exploit the Company's announcement to craft boilerplate, hindsight-based allegations that defendants somehow "knew" that those projections would turn out months later to be inaccurate, but issued them anyway.  The Complaint alleges that those sales projections, as well as other statements regarding "improvement" in sales trends at stores formerly owned by the May Department Stores Company ("May"), were false and misleading because, at the time they were issued, Macy's efforts to re-brand those stores were being "rejected."  But the Complaint does not cite any particularized fact showing that the defendants did not honestly believe that the projections could be met at the time they were issued.  Nobody is alleged to have told any defendant that the sales projections were unattainable, and the Complaint does not identify a single document, report, or piece of data that was in front of the defendants in February 2007 that compelled a conclusion that the first-quarter sales projections could not be met.  Indeed, the fact that Macy's actually met its first-quarter 2007 earnings guidance, while missing the sales projections by a matter of basis points, strongly suggests that this was a routine business hiccup of the kind that frequently

happens in fluid, changing markets, and not a dark scheme to swindle investors. Notably, the Complaint does not charge that Macy's ever falsely reported a single number relating to its actual historical results – only that its crystal ball should have been clearer.

Moreover, the Complaint does not – and cannot – dispute that all of Macy's sales projections were accompanied by meaningful cautionary language. Thus, any claim based on Macy's first-quarter 2007 projections is barred by the PSLRA's safe harbor for forward-looking statements and the bespeaks-caution doctrine.

Accordingly, the Complaint should be dismissed.

## **BACKGROUND**

### A.    **The Parties**

Plaintiff alleges that it is a shareholder of Macy's, and seeks to bring claims on behalf of a proposed class of shareholders who purchased Macy's stock between February 8, 2007 and May 15, 2007 (the "Class Period"). (¶¶ 1, 10.)[1] Macy's is a Delaware corporation with a headquarters in New York City. (¶ 11.) It is the second-largest department store franchise in the United States with more than 850 department stores in 45 states, operating stores under the names "Macy's" and "Bloomingdale's." (¶ 2.)

---

[1] All paragraph references are to the Complaint. On a motion to dismiss pursuant to Rule 12(b)(6), the Court may take judicial notice of (i) matters of public record, including the contents of documents required to be filed with the Securities and Exchange Commission (the "SEC"); (ii) documents referenced in or integral to the Complaint; and (iii) any other documents "that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *In re Global Crossing, Ltd. Sec. Litig.*, 471 F. Supp. 2d 338, 343 (S.D.N.Y. 2006). The Court also may "take judicial notice of well-publicized stock prices." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000). Moreover, the PSLRA provides that "the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant." 15 U.S.C. § 78u-5(e). Documents referred to in the Complaint or otherwise properly considered on a motion to dismiss are being filed separately as exhibits to the Declaration of Michael A. Platt in support of this motion ("Platt Decl. Ex. __").

Defendant Terry J. Lundgren is the Chairman, President, and Chief Executive Officer of Macy's. (¶ 12.) Mr. Lundgren had – and continues to have – a large financial stake in the Company. At the beginning of the Class Period, Mr. Lundgren owned 230,646 shares of Macy's common stock and 2,281,976 exercisable options. (*See* 3/02/07 Lundgren Form 4, Platt Decl. Ex. A; 4/04/07 Form 14-A at 53, Platt Decl. Ex. B.) By the end of the Class Period, Mr. Lundgren had increased his total holdings by 5%, to 205,646 shares of common stock and 2,432,564 exercisable options. (*See* 3/05/07 Lundgren Form 4, Platt Decl. Ex. C; 3/23/07 Lundgren Form 4, Platt Decl. Ex. D; 4/04/07 Form 14-A at 5, Platt Decl. Ex. B.)[2]

Defendant Karen M. Hoguet is the Executive Vice President and Chief Financial Officer of Macy's. (¶ 13) Ms. Hoguet, like Mr. Lundgren, has continued to maintain a substantial investment in the Company. At both the beginning and the end of the Class Period, Ms. Hoguet owned 93,413 shares of Macy's common stock. (*See* 3/06/07 Hoguet Form 4, Platt Decl. Ex. E.) During that period, her exercisable options decreased from 513,238 to 493,982, resulting in a 3.2% decrease in her total holdings. (*See* 4/04/07 Form 14-A at 5, 54, Platt Decl. Ex. B.)[3]

---

[2] Mr. Lundgren sold 45,580 shares of common stock on February 28, 2007, acquired 75,000 shares of common stock on March 1, 2007, acquired 225,000 additional shares through the exercise of stock options on March 22, 2007, and sold 279,420 shares on March 22, 2007, amounting to a net decrease of 25,000 shares during the Class Period. (*See* 3/02/07 Lundgren Form 4, Platt Decl. Ex. A; 3/05/07 Lundgren Form 4, Platt Decl. Ex. C; 3/23/07 Lundgren Form 4, Platt Decl. Ex. D.) Also during the Class Period, Mr. Lundgren exercised 225,000 options, and 375,588 of his previously unexercisable options vested, resulting in a net increase of 150,588 exercisable options. (*See* 3/23/07 Lundgren Form 4, Platt Decl. Ex. D; 4/04/07 Form 14-A at 5, Platt Decl. Ex. B.)

[3] Ms. Hoguet acquired 84,000 shares of common stock through the exercise of stock options on March 2, 2007, and sold 84,000 shares that same day, which resulted in no change to her common stock holdings during the Class Period. (*See* 3/06/07 Hoguet Form 4, Platt Decl. Ex. E.) During the Class Period, Ms. Hoguet exercised those 84,000 options, and 64,744 of her previously unexercisable options vested, resulting in a net decrease of 19,256 exercisable options. (*See id.*; 4/04/07 Form 14-A at 5, 54, Platt Decl. Ex. B.)

### B.    Macy's Acquisition of May

On August 30, 2005, Macy's (then known as Federated Department Stores, Inc.) acquired May. (¶ 15.) After the acquisition, the Company set in motion a plan to integrate the former May stores into Macy's operations. (¶¶ 15-17.) That plan included realigning Macy's geographic divisions to include the acquired May stores, renaming the former May stores to the "Macy's" brand, and decreasing coupon-based promotional activity in favor of credit card promotions. (¶¶ 17-21.) The Complaint does not dispute that Macy's integration plans were fully disclosed to the public.

According to the Complaint, Macy's issued public statements throughout 2006 reporting that "the May integration was proceeding as planned and was 'on track.'" (¶ 18.) The facts demonstrate, however, that Macy's consistently expressed caution regarding the performance of the former May stores. For instance, on November 8, 2006, Ms. Hoguet stated during an analyst call that "[w]hile we would have liked to have seen more progress in the performance of our new Macy's or former May [stores] post-launch, we did see a lot of progress and reason to be confident about the future, especially in the soft goods part of the business." (¶ 18.) The Complaint ignores other public statements by the Company during 2006 that expressly cautioned investors about the sales performance of former May stores. For example, the Company's Form 8-K of August 9, 2006 stated that Macy's was "still in the process of transitioning the former May Company locations with significant merchandise assortment change-outs, clearance sales of discontinued inventory and remodeling activity which is disruptive to the business, and *our sales performance in these stores continues to lag*." (8/9/06 8-K, Platt Decl. Ex. F (emphasis added).) Macy's made a similar statement in November 2006. (11/2/06 8-K, Platt Decl. Ex. G ("Sales in October remained strong in legacy Macy's and Bloomingdale's stores, while *former May Company locations continued to lag*.") (emphasis added).)

-4-

The Company's most recent Form 10-K preceding the putative Class Period had also cautioned investors that "there can be no assurance that the Company's execution of its post-merger strategy to rebrand May stores will improve its operating performance.  The failure of the Company to realize the benefits expected to result from the May acquisition could have a material adverse effect on the Company's business and results of operations."  (4/13/06 10-K at 8, Platt Decl. Ex. H.)

The Complaint does not allege that any of Macy's statements prior to February 2007 were false or misleading.

### C.    Macy's Alleged Misstatements

Plaintiff's claims center on allegations that, in February 2007, Macy's issued sales forecasts for its first fiscal quarter of 2007 (running from February 4 to May 5)[4] that later proved to be inaccurate, and that those inaccurate forecasts caused "artificial inflation" in the Company's share price until the actual first-quarter sales results were announced in mid-May.  (¶¶ 4-7, 25-39, 49-51.)  According to the Complaint, Macy's announced on February 8, 2007 that its same-store sales in January 2007 (the final month of its 2006 fiscal year) had increased by 8.6%, and that sales trends at the former May stores had shown "continued improvement."  (¶ 25 (quoting 2/8/07 8-K, Platt Decl. Ex. I).)  Macy's further announced on February 8 that, beginning in February, Macy's same-store sales figures would include the former May stores and well as legacy Macy's and Bloomingdale's stores.  (*Id.*)

Several weeks later, on February 27, 2007, Macy's announced that its results for the fourth fiscal quarter of 2006 (ending on February 3, 2007) had exceeded its previous guidance, and also provided its financial projections for the first fiscal quarter of 2007.  (¶ 27 (citing 2/27/07 8-K, Platt Decl. Ex. J).)  Macy's projected increased same-store sales of 2.5% to 3.5%,

---

[4] Macy's 2007 fiscal year runs from February 4, 2007 to February 2, 2008.

total sales of $6 billion to $6.1 billion, and earnings of 15 to 20 cents per diluted share. (*See* 2/27/07 8-K, Platt Decl. Ex. J; *see also* ¶¶ 6, 38.) During a conference call that same day, Ms. Hoguet reiterated Macy's guidance for the first fiscal quarter of 2007. (Transcript of Federated's Fourth Quarter 2006 Earnings Conference Call at 3, Feb. 27, 2007, Platt Decl. Ex. K.) She said that the trend in sales at the former May stores had been improving, but that sales had still been disappointing during the fourth quarter of 2006. (¶ 28 (citing Platt Decl. Ex. K at 3).) Ms. Hoguet further explained that the Company's "sales assumption will require continued improvement in the trend in the former May [stores] versus 2006 as we go through the year." (Platt Decl. Ex. K at 3.) Macy's thereafter missed by small amounts its projected overall same-store sales figures for February and March 2007. (¶¶ 30, 32.)[5]

The Complaint says nothing about how Macy's first-quarter sales projections were prepared, what data were considered, what assumptions they embodied, who was involved, or anything showing that the end product did not represent management's honest best judgment about the outlook for the first quarter of 2007.

### D.    Macy's Alleged "Corrective" Disclosures

On May 10, 2007, as a result of sales that "'were disappointing across the country in both new and legacy Macy's stores,'" Macy's announced a decrease of 2.2% in same-store sales for April, compared to projections of a 2.5% to 4% increase. (¶ 34 (quoting 5/10/07 8-K, Platt Decl. Ex. N).) Although the Complaint claims that this announcement "shocked the market" (*id.*), the actual data show that Macy's share price closed at $42.10 on May 10 – just $1.72 (or 3.9%) off

---

[5] The Company's same-store sales for February 2007 increased by 1.2%, compared to a projected increase of 2% to 3%. (¶ 30 (citing 3/8/07 Press Release, Platt Decl. Ex. L).) The Company's same-store sales for March 2007 increased by 2.3%, compared to a projected increase of 2.5% to 4%. (¶ 32 (citing 4/12/07 Press Release, Platt Decl. Ex. M).) The Complaint does not allege that either of these announcements was a "corrective" disclosure.

-6-

the previous day's closing price of $43.82.  (*See* Macy's Historical Stock Prices, Platt Decl. Ex. O.)

On May 16, 2007, before the market opened, the Company announced that due to "'sales in the new Macy's locations [*i.e.*, the former May stores] [that] were disappointing in the quarter,'" its financial performance for the first quarter of 2007 was below its previous expectations.  (¶ 36 (quoting 5/16/07 8-K, Platt Decl. Ex. P).)  Specifically, overall same-store sales for the full quarter had increased 0.6%, compared to the February 27 projection of a 2.5% to 3.5% increase, and total sales revenue was $5.921 billion, compared to the projected $6 billion to $6.1 billion.  (¶ 38; 5/16/07 8-K, Platt Decl. Ex. P.)  The Company, however, met its first-quarter 2007 projection for earnings per diluted share – 16 cents, compared to a projection of 15 cents to 20 cents.  (5/16/07 8-K, Platt Decl. Ex. P.)  In trading that day following this announcement, Macy's stock price declined just 29 cents (0.7%) on May 16 – to close at $39.65 from its previous day's close of $39.94.  (*See* Macy's Historical Stock Prices, Platt Decl. Ex. O.)  By the end of that week (May 18), Macy's stock price had increased slightly to close at $39.70 – just 24 cents (0.6%) below its May 15 close.  (*See id.*)[6]

_____

[6] The Complaint also alleges in two places that on May 14, Ms. Hoguet stated, apparently referring to the Company's reduction in coupon-based promotional activity at former May stores, that "[b]y cutting back as hard as we did, we clearly hurt the business."  (¶¶ 6, 37.)  That allegation, however, is directly contradicted by the Bloomberg.com news article on which it relies.  That article clearly states that Ms. Hoguet made the alleged statement not on *May* 14, but at a "Bank of America investors conference *March* 14 in New York."  (Cotten Timberlake, *Macy's Loses Sales as It Weans Shoppers From Coupons*, Bloomberg Press, May 16, 2007, http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aJBh8DpFkD.Y (last visited Jan. 14, 2008) (emphasis added), Platt Decl. Ex. Q.)  Other public filings confirm that the Bank of America 2007 Consumer Conference was held on March 14, 2007 in New York City.  (*See* 3/14/07 8-K of Charming Shoppes Inc., Platt Decl. Ex. R.)  The Complaint acknowledges that on March 14, Macy's stock had yet to reach its Class Period high.  (¶ 5.)

-7-

**ARGUMENT**

"Under Rule 12(b)(6), the well-pleaded material allegations of the complaint are taken as admitted; but conclusions of law or unwarranted deductions of fact are not admitted." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994) (internal quotations omitted). The Court also need not credit averments "that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 477 n.40 (S.D.N.Y. 2005) (internal quotations omitted).

"To state a claim under § 10(b) and the corresponding Rule 10b-5, a plaintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). Here, the Complaint fails to allege with the particularity required by the PSLRA and Rule 9(b): (1) that defendants made any material misstatement, or (2) that defendants made any such statement with scienter. It also fails to overcome the protections of the PSLRA's safe-harbor for forward-looking statements, 15 U.S.C. § 78u-5, or the common-law bespeaks-caution doctrine. Moreover, because the Complaint fails to state a claim for a primary violation of the securities laws, the Complaint necessarily fails adequately to allege a violation of § 20(a) by the Individual Defendants. The Complaint therefore should be dismissed in its entirety.

**I.    The Section 10(b) Claim Should Be Dismissed Because the Complaint Fails to Allege With Particularity Any Material Misstatement.**

Where a "plaintiff alleges that a defendant made an untrue statement of a material fact or omitted to state a material fact, the [PSLRA] imposes additional pleading requirements [beyond

Rule 8]: the complaint must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 585 (S.D.N.Y. 2007) (quoting 15 U.S.C. § 78u-4(b)(1)). To comply with the PSLRA, a complaint must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

In addition to satisfying the pleading requirements of the PSLRA, plaintiff must also satisfy the pleading requirements of Rule 9(b). Plaintiff's duty to plead with particularity under Rule 9(b) requires it to allege "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990); *see also Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993).

The Complaint's allegations do not even begin to satisfy these requirements.

### A.    The Complaint's Allegations of Fraud Are Based Entirely On Hindsight.

The gravamen of the Complaint is that Macy's first-quarter 2007 sales projections were false and misleading because Macy's failed to disclose at the time those projections were made that "the re-branding of the former May Stores was not being well received and was causing a substantial slow-down in sales and would negatively impact the Company's same-store sales figures." (¶ 5.) Simply put, plaintiff claims that defendants knew that the first-quarter sales projections could not be met, but issued them anyway.

Nowhere, however, does the Complaint provide any specific facts showing that, at the time Macy's sales projections were made, the defendants did not honestly believe those projections. In fact, plaintiff's *only* basis for claiming that the projections were corrupt is the

-9-

May 2007 announcement that Macy's had narrowly missed the same-store sales and revenue projections. As noted above, however, Macy's same-store sales actually increased by 0.6% during the first quarter, and were only about two percentage points lower than projected. Macy's revenue for the quarter was just $79 million – or 1.3% – lower than the projected low-end of $6 billion. And the Company actually met its projected earnings per diluted share. (*Supra* p. 7.) Moreover, as the Complaint suggests, the fact that Macy's missed its projections for the entire quarter was due largely to poor sales across the board in *April* at both legacy Macy's stores and former May stores (¶ 34) – not to some purported fraud that occurred in February 2007.[7] This is a classic case of attempting to plead fraud by hindsight.

"The term 'fraud by hindsight' generally refers to the pleading device wherein a plaintiff (1) alleges that bad news that was ultimately disclosed by the company should have been announced sooner . . . ; or (2) alleges that the defendant made optimistic statements in the past and contends that those statements were fraudulent because subsequent developments proved them to be false." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 494 (S.D.N.Y. 2004). That pleading tactic consistently has been rejected in this Circuit. *See Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) ("Overall, [plaintiff's] arguments with regard to [defendant's] accounting irregularities and overly optimistic disclosures, by themselves, appear to amount to allegations of 'fraud by hindsight,' which this Court has rejected as a basis for a securities fraud complaint."); *Olkey v. Hyperion 1999 Term*

---

[7] The Complaint claims that several retailers, such as Target and J.C. Penney, enjoyed same-store sales increases for the full first quarter of 2007. (¶¶ 6, 38.) But plaintiff fails to note that those two retailers suffered large decreases in same-store sales for the month of April – Target by 6.1% and J.C. Penney by 4.7%. (*See* 5/10/07 Target Press Release, Platt Decl. Ex. S; 5/10/07 J.C. Penney Press Release, Platt Decl. Ex. T.) Indeed, as was widely reported in the financial press, April's retail-sales figures across the industry were "among the worst on record," with "[m]ajor retailers report[ing] a collective 2.3% decline in same-store sales." (James Covert, *Retail-Sales Slide Fuels Concern --- Decline of 2.3% in April Among Worst on Record; Even Wal-Mart Slipped*, Wall St. J., May 11, 2007, at A3, Platt Decl. Ex. U.)

-10-

*Trust, Inc.*, 98 F.3d 2, 8 (2d Cir. 1996) ("'Fraud by hindsight' alone will not sustain a complaint."); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) ("[Plaintiff's] technique is sufficient to allege that the defendants were wrong; but misguided optimism is not a cause of action, and does not support an inference of fraud. We have rejected the legitimacy of 'alleging fraud by hindsight.'" (quoting *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978))).

Plaintiff must do more than plead that Macy's first-quarter sales projections were off by a fraction. Where, as here, "'plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.'" *Xerion Partners I LLC v. Resurgence Asset Mgmt., LLC*, 474 F. Supp. 2d 505, 516 (S.D.N.Y. 2007) (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)). Moreover, "to survive a motion to dismiss, plaintiff 'needs to specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them.'" *Id.* (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001)); *see also In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 26 (S.D.N.Y. 2004) (complaint must "allege[] sufficient facts to support the assertions that material problems existed . . . at the times the statements complained of were made"). But the Complaint does not identify any internal Macy's document that satisfies these requirements:

- It does not identify any internal projections for the first quarter of 2007 that varied from those that were released.

- It alleges no facts suggesting that anyone told defendants that the first-quarter projections could not be met or warned them that the projections were unreasonable.

- It does not set forth any data, information or communications provided to any of the defendants that supposedly led them to believe the projections could not be achieved.

- It contains no allegations that defendants themselves made any private statements at odds with the first-quarter projections at the time they were released.

-11-

- It says nothing about the process for formulating the projections, much less identifying faults in it.

- It contains nothing regarding the assumptions baked into the projections, much less explains why any were so obviously wrong as to have been the product of a fraudulent purpose.

So far as the Complaint shows, nobody ever commented to any defendant that the sales projections were illegitimate, or provided any of them with data calling into question those projections. There simply is nothing alleged in the Complaint that suggests that Macy's sales projections were "false" when they were made – in the sense that defendants did not honestly believe them.

The closest the Complaint comes to providing particularized allegations regarding the supposed falsity of Macy's projections concerns a report allegedly provided to Macy's by Lowe New York, years before the period at issue here. According to the Complaint, Lowe began conducting market research for Macy's in late 2004, and at some point thereafter presented the results of that research "to Macy's senior management in a highly detailed and lengthy study report." (¶ 23.) The Lowe report allegedly "indicated that there would be a significant customer backlash as a result of the nationwide re-branding [of the former May stores], store make-overs and marketing transition away from promotional events and coupons." (*Id.*) These bare allegations about what the report supposedly "indicated" provide none of the particularized facts required by the PSLRA that might show the February 2007 sales forecast was fraudulent. The Complaint does not say when the report was prepared or whether it was ever actually presented to the Individual Defendants. Nor does plaintiff supply any factual information or data contained in the report, any facts by which to determine how definitive any such information was, state what if any assumptions were made in the report, or set forth the conclusions or recommendations provided by the report. And the Complaint does not state whether Macy's

modified its plans or projections in response to the Lowe report. Most importantly, plaintiff provides no explanation as to how a report concerning market research conducted in late 2004 and 2005 could show that defendants believed that Macy's first-quarter 2007 financial projections were unachievable but issued them anyway. In other words, the Complaint meets none of the requirements set forth in *Xerion Partners*, 474 F. Supp. 2d at 516.[8] There is no basis, therefore, for the Complaint's conclusory assertions that the Lowe report somehow shows that the first-quarter 2007 sales projections were fraudulent.

Plaintiff's mantra – that in February 2007 the re-branding effort was failing and sales at the former May stores were declining – does not fill the particularity gap. (¶¶ 20, 21, 24, 26, 31, 37.) Nowhere does the Complaint provide any factual support for that refrain, or link it to any specific facts known to exist in February 2007. Plaintiff's *ipse dixit* cannot satisfy the PSLRA and Rule 9(b). *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) ("A plaintiff cannot base securities fraud claims on speculation and conclusory allegations.").

### B.    The Complaint's Claims of Misstatements Are Belied By a Review of Defendants' Actual Statements.

The Complaint further alleges that Macy's financial projections in February 2007 must have been false and misleading because "Defendants have now [in May 2007] admitted that in February and March sales at the former May stores were weak." (¶ 24.) This allegation is fatally flawed, for Macy's clearly informed investors both prior to and during February 2007 that sales at the former May stores were weak and lagging. The Complaint offers not the slightest factual data to suggest that Macy's did not seek to factor these circumstances into its projections.

---

[8] The Complaint's incorporation of a lengthy excerpt from a September 30, 2007 New York Times article actually reinforces the conclusion that Macy's had reason to expect that its re-branding efforts would not affect sales: "Macy's had reason to think it could pull off the cuts [in coupons at former May stores]. Before the merger, it had trimmed coupons at its own stores by about 25 percent. But that reduction was gradual, taking five years." (¶ 40.)

-13-

Macy's SEC filings during the latter part of 2006 expressly disclosed that sales at the former May stores "continue[d] to lag."  (8/9/06 8-K, Platt Decl. Ex. F; 11/2/06 8-K, Platt Decl. Ex. G.)  In February 2007, at the same time that Macy's issued its financial projections, it clearly told the market that sales at former May stores were weak.  Indeed, during an analyst call on February 27, 2007 – the transcript of which is referenced in the Complaint (¶ 28) – Karen Hoguet repeatedly referred to the fact that, during the fourth quarter of 2006, sales at former May stores were weak, and that while the trend had been improving, Macy's financial projections depended on continued improvement in those sales:

- "We did not produce the sales we had hoped for in the former May [stores] but the trend is definitely improving and we feel good about our ability to deliver the expected 2% to 3.5% comp store sales increase in 2007, which, as you know, includes both the Macy's and former May Company [stores]."  (Transcript of Federated's Fourth Quarter 2006 Earnings Conference Call at 1-2, Feb. 27, 2007, Platt Decl. Ex. K.)

- "[W]e were disappointed with sales in the former May or as we now call them the new Macy [stores].  However, it's important to note that the trend in those [stores] has improved."  (*Id.* at 2.)

- "[T]he sales in the May [stores], as you know, were weaker than expected.  We are doing the right things in these new stores but it has taken longer both to build a customer base and also for sales associates, store executives, as well as customers, to get used to the changes."  (*Id.*)

- "In 2007, we're expecting total sales of $27.1 billion to $27.6 billion and a comp store sales increase of 2% to 3.5%.  . . . This sales assumption will require continued improvement in the trend in the former May [stores] versus 2006 as we go through the year.  The trend has been improving since mid December and we believe our expectation to be reasonable, but we, like you, will be watching our sales trends closely and we will react with receipt and expense reductions if we turn out to be wrong."  (*Id.* at 3.)

- "This [getting May customers used to Macy's strategy] is probably the most challenging of all the issues we face.  We know it takes time to retrain customers to recognize good values without coupons.  But as we know from our Macy's experience, it can happen, and it is an objective worth pursuing."  (*Id.* at 4.)

-14-

Thus, there is no question that Macy's disclosed that sales in former May stores were weak or that it highlighted the former May stores as the major area for risk in 2007.

Evidently realizing that Macy's consistently leveled with the market that sales at the former May stores were weak, the Complaint takes issue with Macy's statements during the February 27 analyst call that sales were "improving." According to the Complaint, "it was materially misleading to represent that comp trends were improving" at former May stores "because as Defendant Hoguet has now admitted, sales at the former May stores were weak in February and March." (¶ 29; *see also* ¶ 37 ("[O]n May 16, 2007, Hoguet directly contradicted Defendants' previous representations that February 2007 sales at former May stores had continued to improve over fourth quarter of 2006 sales results.").) Plaintiff's logic is patently flawed, and borders on the absurd.

To begin with, the Complaint does not cite a single document, report, or other particularized item of information suggesting that sales trends in former May stores were *not* improving during the fourth quarter of 2006 and through February 2007. More importantly, notwithstanding the Complaint's attempt to conjure up some contradiction, the statement that sales at former May stores were weak is not at all inconsistent with the statement that sales at former May stores were improving. Just as a hospital patient can be sick and yet recovering, so sales can be *both* weak and improving at the same time, and that is exactly what Macy's told the market. (Transcript of Federated's Fourth Quarter 2006 Earnings Conference Call at 1-4, Feb. 27, 2007, Platt Decl. Ex. K.)

In any event, the February 27 analyst call makes clear that the market fully understood that improvement in sales trends at the former May stores did not mean that same-store sales in

-15-

those stores actually were going to be positive anytime soon.  The analysts' questions to Ms.

Hoguet assumed as much:

> [Question]:  [W]hen would you expect the May [stores] to start to
> – the legacy May [stores] to start to comp positive in your
> assumptions?
>
> Karen Hoguet:  You know something, I'm not tracking it that way
> anymore so I don't even know how to answer that.

(*Id.* at 9.)

Furthermore, the Complaint takes way too much liberty in describing Macy's alleged

"corrective" disclosures in May 2007.  The Complaint alleges that "[b]etween May 10, 2007 and

May 15, 2007, Macy's disclosed that customers of the former May stores had actually rejected

the rapid conversion [of the former May stores], that sales at the Company's new Macy's stores

had declined during the first quarter of 2007, and that the Company's decision to dramatically

cut the number of days coupons could be used at the former May locations had badly damaged

sales."  (¶ 6.)  But Macy's public disclosures during that period said no such thing.  Those

disclosures never included anything about a "rejection" of its re-branding efforts or attributed its

failure to meet its sales projections to a reduction in coupon-based promotional activity at the

former May stores.  (*See* 5/10/07 8-K, Platt Decl. Ex. N; 5/16/07 8-K, Platt Decl. Ex. P.)  As

noted above, what Macy's announced was that in a single quarter, it had missed projected same-

store sales by a matter of basis points, while still achieving overall earnings within the projected

range.  (*See* 5/10/07 8-K, Platt Decl. Ex. N; 5/16/07 8-K, Platt Decl. Ex. P.)[9]

At bottom, the factual allegations of the Complaint establish nothing more than that some

---

[9] As noted above, the Complaint erroneously alleges that Ms. Hoguet stated on May 14, 2007 that "[b]y cutting back as hard as we did, we clearly hurt the business."  (*See supra* n.6.) The fact that Ms. Hoguet actually made that statement on March 14 reinforces the notion that, long before May 2007, the market was well aware of the information that plaintiff claims Macy's concealed:  that Macy's faced challenges in integrating the former May stores, and that those challenges could affect Macy's operations and sales performance.

of Macy's first-quarter 2007 financial projections ultimately turned out to be wrong at the

margins.  But "[w]e have not yet come to the point that a lack of clairvoyance constitutes fraud."

*In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d at 26-27; *see also In re Nokia Oyj (Nokia Corp.) Sec.

*Litig.*, 423 F. Supp. 2d 364, 406 (S.D.N.Y. 2006) ("'That the sales did later fall . . . does not make

an earlier rosy prediction fraudulent other than by hindsight.").

## II.    The Section 10(b) Claim Should Be Dismissed Because the Complaint Fails to Allege Scienter.

Even if plaintiff had pleaded falsity with particularity, its § 10(b) claim still would have

to be dismissed because it fails to "state with particularity facts giving rise to a strong inference

that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2), (3).  The

required state of mind is scienter – a mental state embracing "intent to deceive, manipulate, or

defraud."  *Novak*, 216 F.3d at 306 (internal quotations omitted).  A plaintiff may establish

scienter "by alleging facts (1) showing that the defendants had both motive and opportunity to

commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or

recklessness." *ATSI Commc'ns*, 493 F.3d at 99.  "'Where motive is not apparent, it is still

possible to plead scienter by identifying circumstances indicating conscious behavior by the

defendant, though the strength of the circumstantial allegations must be correspondingly

greater.'"  *Kalnit*, 264 F.3d at 142.

In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504-05 (2007), the

Supreme Court clarified that to plead a strong inference of scienter under the PSLRA, the

inference "must be more than merely plausible or reasonable – it must be cogent and at least as

compelling as any opposing inference of nonfraudulent intent."  In evaluating the sufficiency of

the pleadings, courts are to "consider the complaint in its entirety, as well as other sources courts

ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss[.]"  *Id.* at 2509.  Courts

must "consider plausible nonculpable explanations for the defendants' conduct," and the inference of scienter must be "strong in light of" such alternative explanations. *Id.* at 2510. "A complaint will survive . . . only if a reasonable person would" – the Court used "would," not "could" – "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

**A. The Complaint Fails to Raise a Strong Inference of Conscious Misbehavior or Recklessness.**

"To survive dismissal under the conscious misbehavior theory, [plaintiffs] must show that they alleged reckless conduct by the [defendants], which is at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit*, 264 F.3d at 142 (internal quotations omitted). "In order to plead 'recklessness,' plaintiffs must 'specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements.'" *Caiafa v. Sea Containers Ltd.*, No. 06 Civ. 2565 (RMB), 2007 WL 2815633, at *10 (S.D.N.Y. Sept. 25, 2007) (quoting *Novak*, 216 F.3d at 308). "And, generally, [w]here plaintiffs contend defendants had access to contrary facts, [plaintiffs] must specifically identify the reports or statements containing this information." *Id.* (internal quotations omitted); *see also In re Aegon N.V. Sec. Litig.*, No. 03 Civ. 0603(RWS), 2004 WL 1415973, at *17 (S.D.N.Y. June 23, 2004) (plaintiffs failed to adequately plead scienter because they did "not set forth any evidence of reports or data to establish that the Defendants knew that their reserves were inadequate or that their economic assumptions were improper.").

As discussed above, the Complaint is wholly devoid of reference to any document, report or other information that defendants supposedly knew about or recklessly disregarded that

suggested Macy's first-quarter 2007 financial projections were not achievable at the time they were issued. The Complaint therefore does not properly allege conscious misbehavior or recklessness. *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co.*, 75 F.3d 801, 813 (2d Cir. 1996) ("Since we have already determined that the Complaint fails adequately to allege that defendants' statements were false (affirmatively or through omissions), the Complaint obviously fails to allege facts constituting circumstantial evidence of reckless or conscious misbehavior on the part of defendants in making the statements."). Indeed, there is not even enough in the Complaint to show that Macy's projections were negligently formulated, let alone that there was intentional or reckless misconduct here.

Rather than satisfy its obligation to identify specific reports or information, plaintiff instead relies on the conclusory allegation that the Individual Defendants must have been aware of such information, assuming it ever existed, by virtue of their positions at Macy's. (¶ 41 ("Because of their managerial positions with Macy's, each [Individual Defendant] had access to the adverse undisclosed information about Macy's business, financial condition and prospects and knew (or deliberately disregarded) that the adverse facts alleged herein rendered the positive representations made during the Class Period materially false and misleading.").) That boilerplate consistently has been rejected as insufficient to demonstrate recklessness. *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d at 406 (rejecting as insufficient to establish scienter plaintiffs' argument that "the individual Defendants knew, or should have known, that they were misrepresenting material facts, based on their senior positions in the company, and by holding themselves out as knowledgeable about Nokia's products in presentations"); *Kinsey v. Cendant Corp.*, No. 04 Civ. 0582 (RWS), 2005 WL 1907678, at *5 (S.D.N.Y. Aug. 10, 2005) ("conclusory allegations that a corporate officer had 'access' to information that contradicted the

alleged misstatements are insufficient to raise a strong inference of recklessness"); *Glickman v. Alexander & Alexander Servs., Inc.*, No. 93 Civ. 7594(LAP), 1996 WL 88570, at *14 (S.D.N.Y. Feb. 29, 1996) (mere access to information "is an inadequate basis for scienter" given that it "would expose virtually any CEO, by virtue of his or her position alone, to liability").

The Complaint further alleges that the Individual Defendants must have been "personally familiar with the quality of the Company's projected earnings and the deleterious effect the rapid conversion of merchandise and elimination of promotional sales efforts was having at the former May stores because they monitored Macy's revenues and were closely monitoring the performance of Macy's operations via reports from Macy's finance department, which were generated and provided to them on a regular basis." (¶ 42.) Yet again, general allegations that the individual defendants monitored Macy's revenues and received regular reports regarding Macy's "operations" are insufficient to establish scienter. *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d at 407 ("the general allegations that Defendants received weekly reports on revenue amount to unsubstantiated speculation that Defendants knew their public statements were inaccurate at any point before [Nokia's] April 6 statement announcing its disappointing first quarter 2004 results"); *In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478(NRB), 2003 WL 22801416, at *10 (S.D.N.Y. Nov. 25, 2003) (fact that defendants "had access to and generally reviewed interim sales data" does not mean that they would be aware "that their predictions for the entire quarter would prove false").

Finally, the majority of plaintiff's allegations do not refer to the Individual Defendants by name and fail to differentiate between actions attributed to the Company and the Individual Defendants. The Complaint is permeated with references to the "Defendants" without specifying which defendant is at issue. For example, the Complaint, at paragraph 5, generally alleges that

-20-

"Defendants knew what the market did not – the re-branding of the former May Stores was not being well received . . . ." Similarly, paragraph 24 states: "By the start of the Class Period, Defendants knew or recklessly disregarded that, as the Lowe Report had forewarned, the re-branding of the May stores was being negatively received by customers . . . ." (*See also* ¶¶ 49-56.) Likewise, plaintiff fails to differentiate between what each Individual Defendant is alleged to have done or what information each Individual Defendant had. (¶¶ 41-43, 58.) These undifferentiated references to "Defendants" and "Individual Defendants" cannot satisfy plaintiff's burden to allege a "cogent and compelling" inference of scienter. *See In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 381 (S.D.N.Y. 2004) ("group pleading," or referring to all defendants under a common label, cannot satisfy plaintiff's obligation to "allege facts sufficient to show that the Defendants had knowledge that the statements were false at the time they were made"); *accord In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 440 (S.D.N.Y. 2005).

**B.    Allegations Regarding Insider Sales Do Not Raise a Strong Inference of Scienter.**

Plaintiff also attempts to establish scienter through allegations that the Individual Defendants had a "motive and opportunity" to commit fraud, pointing to the fact that the two Individual Defendants and various other Macy's officers and directors sold Macy's stock during the Class Period. (¶ 45.) The Second Circuit has held, however, that allegations of "motive and opportunity" must be sufficiently "concrete and personal" to give rise to a strong inference of scienter. *Novak*, 216 F.3d at 307, 311. "[T]he fact that insiders sold company stock, standing alone, does not give rise to an inference of scienter." *In re BISYS Sec. Litig.*, 397 F. Supp. 2d at 444; *see also Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (corporate insiders may sell stock for reasons other than insider trading, including "to fund major family expenses, diversify [a] portfolio, . . . arrange [an] estate plan," or pay children's college tuition). Each case must be

-21-

judged on its own facts and circumstances, and there is no strong inference of scienter where the sales were not "unusual." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995).

Plaintiff makes no effort to satisfy these pleading requirements. The Complaint alleges only the number of shares each Individual Defendant sold, the share price on the date sold, and the proceeds from each sale. (¶ 45.) Such information alone makes it "impossible . . . to determine whether the sales were 'unusual in timing or amount.'" *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 151 (D. Conn. 2007) (rejecting scienter allegations where complaint "alleges only the number of shares each executive sold, the share price on the date sold, and the gross profit realized from each sale"); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d at 445 ("while the gross proceeds may be relevant to scienter, they are not very probative where, as here, the complaint is essentially devoid of other factual allegations indicative of culpable knowledge or intent").

Plaintiff also nakedly asserts, without providing any context, that the alleged sales were large in absolute dollar terms and as a percentage of Mr. Lundgren's and Ms. Hoguet's personally-held common stock. (¶ 44.) But these supposed "facts" also do not raise a strong inference of scienter. When considering the combined stock and exercisable options owned by Mr. Lundgren and Ms. Hoguet – which plaintiffs do not do – it is clear that neither liquidated a large percentage of his/her Macy's holdings. *See In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 290 (S.D.N.Y. 2006) (defendants' stock options "must be considered along with shares actually held in determining whether insider sales are significant.").[10] As Chart 1 below – based on the Individual Defendants' Form 4 filings and Macy's proxy statements – demonstrates, Mr.

---

[10] Where, as here, "[v]irtually all of the shares sold by the officers in this case, were originally vested stock options that were converted to shares and then immediately sold," there is "no reason to distinguish vested stock options from shares because vested stock options can be converted easily to shares and sold immediately." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 & n.16 (9th Cir. 1999).

Lundgren and Ms. Hoguet sold 10.99% and 13.85%, respectively, of their combined stock and exercisable options holdings during the Class Period.

### Chart 1

| Name | Date of Sale | Shares of Common Stock Sold | Shares of Common Stock Owned After Sale | Shares of Common Stock Owned Before Sale | Percent of Shares of Common Stock Sold | Number of Exercisable Options Owned Before Sale | Number of Shares of Common Stock and Exercisable Options Owned Before Sale | Percent of Common Stock and Exercisable Options Sold |
|---|---|---|---|---|---|---|---|---|
| **Lundgren** | 3/22/2007 | 279,420 | 205,646 | 485,066 | 57.60% | 2,056,976 | 2,542,042 | 10.99% |
| | 2/28/2007[11] | 45,580 | 185,066 | 230,646 | 19.76% | 2,281,976 | 2,512,622 | 1.81% |
| | 12/19/2006 | 8,270 | 230,646 | 238,916 | 3.46% | 2,281,976 | 2,520,892 | 0.33% |
| | 2/27/2006 | 131,250 | 119,312 | 250,562 | 52.38% | 912,863 | 1,163,425 | 11.28% |
| | 6/1/2005 | 25,300 | 121,184 | 146,484 | 17.27% | 1,044,113 | 1,190,597 | 2.12% |
| | 3/22-24/2004 | 7,142 | 148,548 | 155,690 | 4.59% | 693,750 | 849,440 | 0.84% |
| | 11/19/2003 | 6,250 | 154,534 | 160,784 | 3.89% | 693,750 | 854,534 | 0.73% |
| | 3/24/2003 | 6,704 | 154,320 | 161,024 | 4.16% | 700,000 | 861,024 | 0.78% |
| **Hoguet** | 3/2/2007 | 84,000 | 93,413 | 177,413 | 47.35% | 429,238 | 606,651 | 13.85% |
| | 3/9/2006 | 22,000 | 25,558 | 47,558 | 46.26% | Not Available | Not Available | Not Available |
| | 6/1/2005 | 10,567 | 25,552 | 36,119 | 29.26% | Not Available | Not Available | Not Available |
| | 11/17/2004 | 9,000 | 36,033 | 45,033 | 19.99% | Not Available | Not Available | Not Available |
| | 9/28/2004 | 19,000 | 35,155 | 54,155 | 35.08% | Not Available | Not Available | Not Available |
| | 3/22/2004 | 98 | 35,935 | 36,033 | 0.27% | Not Available | Not Available | Not Available |
| | 11/24/2003 | 15,000 | 35,684 | 50,684 | 29.60% | Not Available | Not Available | Not Available |
| | 6/25/2003 | 6,000 | 35,683 | 41,683 | 14.39% | Not Available | Not Available | Not Available |

---

[11] Although Mr. Lundgren sold 45,580 shares of common stock on February 28, 2007, during the Class Period, the Complaint does not allege that this sale constituted improper insider trading. (*See* ¶ 45.)  Nor could plaintiff do so, for the relevant Form 4 indicates that the purpose of the sale was to satisfy either a stock option exercise price or Mr. Lundgren's tax liability.  (*See* 3/02/07 Lundgren Form 4 (using Transaction Code "F" to describe Mr. Lundgren's stock sale), Platt Decl. Ex. A; General Instructions For Form 4 (directing filers to use Transaction Code "F" for a "[p]ayment of exercise price or tax liability by delivering or withholding securities incident to the receipt, exercise or vesting of a security issued in accordance with Rule 16b-3"), *available at* http://www.sec.gov/about/forms/form4data.pdf (last visited Jan. 14, 2008).)  *See In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (no scienter where purpose of the trades was to "make payments required for the exercise of stock options or to pay taxes").  Because the relevant Form 4 does not indicate that Mr. Lundgren exercised any options on or around February 28, the stock sale on that date likely was intended to satisfy Mr. Lundgren's tax liability.

-23-

The Second Circuit has rejected any inference of scienter where the defendants were alleged to have sold such a small proportion of their total holdings. *See Acito*, 47 F.3d at 54 (sale of 11% of defendant's "shares and/or options" did not give rise to an inference of scienter); *Rothman v. Gregor*, 220 F.3d 81, 95 (2d Cir. 2000) (holding that, although defendant's "sales . . . resulted in a $20 million return," the inference of scienter was weakened by the fact that the sales represented "only about 9.3 percent of the . . . stock [defendant] beneficially owned," including vested options). *See also In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d at 291-92 (defendant's sale of 17.4% of common stock and exercisable options is insufficient to establish scienter); *Ronconi*, 253 F.3d at 435 (sales by a CEO and a CFO of 10% and 17% of their stock and exercisable options did not give rise to a strong inference of scienter).

Additionally, as shown in Chart 2 below – also based on the Form 4 filings and Macy's most recent proxy statement, *see supra* p. 3 & notes 2 and 3 – Mr. Lundgren and Ms. Hoguet each continue to maintain large personal investments in Macy's. Mr. Lundgren even "*increased* [his] holdings during the Class Period – a fact wholly inconsistent with fraudulent intent." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (emphasis in original); *see also In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 541 (3d Cir. 1999) ("Far from supporting a 'strong inference' that defendants had a motive to capitalize on artificially inflated stock prices, [their continued retention of large amounts of Advanta stock] suggest[s] they had every incentive to keep Advanta profitable.").

**Chart 2**

| Name | Common Stock Held at Start of Class Period (2/8/2007) | Common Stock Held at End of Class Period (5/15/2007) | Exercisable Options Held at Start of Class Period (2/8/2007) | Exercisable Options Held at End of Class Period (5/15/2007) | Common Stock and Exercisable Options Held at Start of Class Period (2/8/2007) | Common Stock and Exercisable Options Held at End of Class Period (5/15/2007) | Percentage Change In Common Stock and Exercisable Options Held Over the Class Period |
|---|---|---|---|---|---|---|---|
| Lundgren | 230,646 | 205,646 | 2,281,976 | 2,432,564 | 2,512,622 | 2,638,210 | 5.00% |
| Hoguet | 93,413 | 93,413 | 513,238 | 493,982 | 606,651 | 587,395 | -3.17% |

Likewise, any inference of scienter is strongly negated by Macy's repurchase of a substantial block of its own stock during the Class Period. On February 27, 2007, Macy's announced that its board of directors had authorized a $4 billion increase in its stock buyback program, and that Macy's had used that authorization to effect the immediate repurchase of 45 million shares of outstanding common stock for approximately $2 billion. (2/27/07 8-K, Platt Decl. Ex. V.) It would have been entirely irrational for Macy's to repurchase its own stock if it believed that its stock price was artificially pumped up.

The Complaint's insider trading allegations are also fatally flawed in two additional respects. First, Chart 1 above shows that both Mr. Lundgren and Ms. Hoguet sold approximately the same percentage of their holdings in late February or early March 2006 as they each sold in March 2007. For example, Mr. Lundgren sold 11.28% of his total holdings on February 27, 2006 – an even larger proportion than the 10.99% he sold on March 22, 2007 when he allegedly had a motive to commit fraud. Even limiting the analysis solely to Mr. Lundgren's common stock, he sold approximately the same percentage on February 27, 2006 (52.38%) as he sold on March 22, 2007 (57.60%). Likewise, Ms. Hoguet sold 47.35% of her common stock on March 2, 2007 when she supposedly had a motive to defraud, and similarly sold 46.26% one year

-25-

earlier, on March 9, 2006.[12]  Chart 1 also demonstrates that Mr. Lundgren and Ms. Hoguet each

sold Macy's stock in March 2004, and that Mr. Lundgren also sold stock in March 2003.  This

pattern of selling stock each March for the past several years was broken only with respect to

March 2005, during which time Macy's proposed acquisition of May had been announced and

was awaiting approval by Macy's shareholders and the U.S. Federal Trade Commission.

Simply stated, the timing and amount of the Individual Defendants' challenged trades are

not inconsistent with their previous trades.  *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp.

2d at 561 (rejecting stock sales as the basis for a motive allegation where the evidence showed "a

consistent pattern of trading"); *Malin*, 499 F. Supp. 2d at 151 (rejecting scienter allegations

where "[t]he Individual Defendants' sales during the Class Period, when compared with the

Individual Defendants' prior trading history, are not unusual in timing or amount").

Second, almost all of the shares sold by Mr. Lundgren and all of the shares sold by Ms.

Hoguet during the Class Period were obtained through the exercise of ten-year options that were

to expire in March 2008.  For example, of the 279,420 shares of common stock that Mr.

Lundgren sold on March 22, 2007, 225,000 were obtained through the same-day exercise of

options that were scheduled to expire on March 27, 2008.  (*See* 3/23/07 Lundgren Form 4, Platt

Decl. Ex. D.)  Likewise, all 84,000 shares of common stock that Ms. Hoguet sold on March 2,

2007 were obtained through the same-day exercise of options that were to expire on March 27,

2008.  (*See* 3/06/07 Hoguet Form 4, Platt Decl. Ex. E.)  Moreover, Mr. Lundgren and Ms.

Hoguet had a history of exercising options and selling the resulting shares approximately one

---

[12] Prior to its most recent proxy statement, Macy's proxy statements did not include Ms. Hoguet's options holdings.  Thus, defendants are not able to demonstrate through SEC filings that Ms. Hoguet's pattern of trading as a percentage of her total common stock and exercisable options holding was not unusual.  Of course, it is not defendants' burden to disprove that any Individual Defendant's trading was unusual.  The burden is on plaintiff to allege unusual trading, and it has not done so.

year before the options' expiration date.  For example, of the 131,250 shares that Mr. Lundgren

sold on February 27, 2006, 125,000 were obtained from the same-day exercise of options that

were to expire on March 28, 2007.  (*See* 2/28/06 Lundgren Form 4, Platt Decl. Ex. W.)

Similarly, of the 22,000 shares that Ms. Hoguet sold on March 9, 2006, 7,000 were from options

set to expire on March 28, 2007 and 15,000 were from options set to expire on October 30, 2007.

(*See* 3/10/06 Hoguet Form 4, Platt Decl. Ex. X.)  There simply is nothing unusual or suspicious

about exercising options that are approaching expiration.[13]

### III.    The Alleged Misstatements Are Forward-Looking Statements Protected By the PSLRA Safe Harbor and the Common-Law Doctrine of "Bespeaks Caution."

Each of the statements alleged in the Complaint to be false or misleading is a forward-

looking statement within the meaning of the PSLRA and the common-law "bespeaks caution"

doctrine, and is accordingly entitled to a heightened level of protection against allegations of

fraud.  *See* 15 U.S.C. § 78u-5.  Because these forward-looking statements were accompanied by

meaningful cautionary language, they cannot give rise to liability under the securities laws.

The PSLRA creates a "safe harbor" relating to certain "forward-looking" statements.  *Id.*

The PSLRA definition of forward-looking statement includes "a statement containing a

*projection of revenues*, income (including income loss), earnings (including earnings loss) per

share, capital expenditures, dividends, capital structure, or other financial items[.]" 15 U.S.C.

---

[13] The Complaint's allegations of sales by various other Macy's officers and directors during the Class Period (¶ 45) are of no help to plaintiff.  Aside from the fact that none of those insiders has been named as a defendant in this action, the Complaint does not include any allegations demonstrating that those sales were unusual or suspicious in any way.  There are no allegations, for instance, regarding the pre-Class Period stock sales by those individuals, no allegations regarding the percentage of holdings sold, no comparison of holdings before and after the Class Period, and no allegations regarding the expiration of options.  The Complaint simply provides the number of shares each individual sold, the share price on the date sold, and the proceeds from each sale.  (*Id.*)  Those allegations are just as deficient with respect to these other insiders as they are for Mr. Lundgren and Ms. Hoguet.  *See Malin*, 499 F. Supp. 2d at 151; *In re BISYS Sec. Litig.*, 397 F. Supp. 2d at 445.

§78u-5(i)(1)(A) (emphasis added); *see also In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 235 (S.D.N.Y. 2006). The purpose of the PSLRA's safe-harbor provision is to encourage companies to share more forward-looking information with investors without fear of automatic lawsuits if things do not pan out.[14] Under that provision, a forward-looking statement, as opposed to a statement of present or historical fact, may not give rise to liability under the securities laws if it is either (1) "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or (2) made without knowledge that the statement is false or misleading. 15 U.S.C. §78u-5(c)(1); *see also In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 380 (S.D.N.Y. 2007).

The common-law counterpart to the safe harbor provision of the PSRLA is the "bespeaks caution" doctrine. That doctrine provides that forward-looking statements made in connection with the purchase or sale of securities cannot be deemed material as a matter of law if the statement is accompanied by appropriate cautionary language. *See In re IAC/InterActiveCorp Secs. Litig.*, 478 F. Supp. 2d 574, 586 (S.D.N.Y. 2007) ("Under the bespeaks caution doctrine, courts have held that meaningful cautionary language can render omissions or misrepresentations immaterial.") (internal quotations omitted).

Here, all of Macy's financial projections were accompanied by appropriate cautionary language. In each earnings release and on each analyst call cited by plaintiff in which the first-quarter 2007 financial projections were discussed, Macy's expressly cautioned investors against relying on its forward-looking statements, pointing investors to risk factors that could cause

---

[14] *See* Private Securities Litigation Reform Act of 1995, H.R. No. 104-369, at 43 (1995) (Conf. Rep.), *reprinted in* 1995 U.S.C.C.A.N. 730, 742 ("[f]ear that inaccurate projections will trigger the filing of securities class action lawsuit[s] has muzzled corporate management"; "[t]he Conference Committee has adopted a statutory 'safe harbor' to enhance market efficiency by encouraging companies to disclose forward-looking information").

actual results to differ materially from those predicted in such statements. Macy's earnings

releases summarized the risk factors and directed investors to a discussion of those risk factors in

its public filings:

> All statements in this press release that are not statements of
> historical fact are forward-looking statements within the meaning
> of the Private Securities Litigation Reform Act of 1995. Such
> statements are based upon the current beliefs and expectations of
> Federated's management and are subject to significant risks and
> uncertainties. Actual results could differ materially from those
> expressed in or implied by the forward-looking statements
> contained in this release because of a variety of factors, including
> conditions to, or changes in the timing of, proposed transactions,
> prevailing interest rates, competitive pressures from specialty
> stores, general merchandise stores, manufacturers' outlets, off-
> price and discount stores, new and established forms of home
> shopping (including the Internet, mail-order catalogs and
> television) and general consumer spending levels, including the
> impact of the availability and level of consumer debt, the effect of
> weather and other factors identified in documents filed by the
> company with the Securities and Exchange Commission.

(2/8/07 8-K, Platt Decl. Ex. I; 2/27/07 8-K, Platt Decl. Ex. J; 3/8/07 Press Release, Platt Decl.

Ex. L; 4/12/07 Press Release, Platt Decl. Ex. M; 5/10/07 8-K, Platt Decl. Ex. N; 5/16/07 8-K,

Platt Decl. Ex. P.)

Likewise, during Macy's February 27, 2007 analyst call, management directed investors

to the discussion of risk factors in its filings:

> Keep in mind that all forward-looking statements are subject to risks
> and uncertainties that could cause the Company's actual results to
> differ materially from the expectations and assumptions mentioned
> today due to a variety of factors that affect the Company, including
> the risks specified in the Company's most recently filed Form 10-K
> and Form 10-Q.

(Transcript of Federated's Fourth Quarter 2006 Earnings Conference Call at 1, Feb. 27, 2007,

Platt Decl. Ex. K.)

Macy's most recently filed Form 10-K and Form 10-Q prior to its financial projections

for the first quarter of 2007 explained that the acquisition and integration of the former May

stores was a risk factor that could affect the Company's operating performance:

> *The benefits expected to be realized from the May acquisition are*
> *subject to various risks, and the Company's failure to integrate*
> *May successfully or on a timely basis into the Company's*
> *operations could reduce the Company's profitability.*
>
> The Company's acquisition of May during the third quarter of
> 2005 was a significant acquisition for the Company.  The
> Company's success in fully realizing the anticipated benefits from
> the acquisition will depend in large part on achieving anticipated
> synergies, business opportunities and growth prospects.  There can
> be no assurance that these synergies, business opportunities and
> growth prospects will materialize, and the Company's ability to
> benefit from the May acquisition is subject to both the risks
> affecting the Company's business generally and the difficulties
> associated with integrating large business organizations.  In
> addition, there can be no assurance that the Company's execution
> of its post-merger strategy to rebrand May stores will improve its
> operating performance.  The failure of the Company to realize the
> benefits expected to result from the May acquisition could have a
> material adverse effect on the Company's business and results of
> operations.

(4/13/06 10-K at 8, Platt Decl. Ex. H; *see also* 12/07/06 10-Q, Platt Decl. Ex. Y ("There have

been no material changes to the Risk Factors described in . . . the Company's Annual Report on

Form 10-K, as amended, for the fiscal year ended January 28, 2006 as filed with the Securities

and Exchange Commission.").)  Because of these admonitions, Macy's financial projections are

fully protected under the PSLRA's safe harbor and the bespeaks-caution doctrine.

"The only exception to [the PSLRA safe harbor] rule is that there may be liability where

(1) the forward-looking statement was made with actual knowledge that it was false; or

(2) where the forward-looking statement misrepresents present facts." *In re*

*IAC/InterActiveCorp*, 478 F. Supp. 2d at 586 (internal quotations omitted).  The Complaint does

not satisfy this exception.  With one exception, none of the statements challenged by the

-30-

Complaint are statements of present or historical fact.[15]  Moreover, while Macy's financial projections may not have panned out, that does not mean that they were known to be unachievable at the time they were made.  *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) ("[M]isguided optimism is not a cause of action, and does not support an inference of fraud.  We have rejected the legitimacy of 'alleging fraud by hindsight.'").  As discussed above, the Complaint does not allege with particularity that Defendants or anyone else had any information suggesting that the projections were a sham when they were made.

Furthermore, while the Complaint accurately states that Macy's barely missed its revenue and same-store sales projections for the first quarter of 2007, it omits that Macy's met its projections for first-quarter 2007 earnings per diluted share.  (5/16/07 8-K, Platt Decl. Ex. P.) This undermines any allegation that Macy's first-quarter 2007 projections were known to be unachievable when they were made.  *See IAC/InterActiveCorp*, 478 F. Supp. 2d at 587.

The Complaint therefore fails to overcome the PSLRA's safe harbor for forward-looking statements and the bespeaks-caution doctrine.

## IV.    Plaintiff's "Control Person" Claims Should Be Dismissed.

The Complaint alleges secondary liability under § 20(a) of the Securities Exchange Act (¶¶ 57-58), which imposes liability on those who "controlled" any person liable for a primary violation of the securities laws.  15 U.S.C. § 78t(a).  Because the Complaint has not pled a primary violation, plaintiff's control person claim must be dismissed.  *See Brown v. Hutton Group*, 795 F. Supp. 1317, 1324 (S.D.N.Y. 1992) ("it is impossible to state a claim for secondary liability under Section 20 without first stating a claim for some primary violation of the security

---

[15] The Complaint does challenge Ms. Hoguet's February 27 statement that sales trends at the former May stores were "improving" – arguably a statement of present fact.  (¶¶ 29, 37.) But as discussed above, *supra* p. 15, that allegation is wholly unparticularized, so it does not matter whether the safe harbor applies to that statement.

laws on the part of the controlled party"), *aff'd*, 991 F.2d 1020 (2d Cir. 1993); *accord In re Alstom S.A. Sec. Litig.*, 406 F. Supp. 2d 433, 486 (S.D.N.Y. 2005).  The Complaint also fails to plead with particularity that defendants engaged in any culpable conduct, further precluding liability under § 20(a).  *See Kalin v. Xanboo*, 04-CV-5931(KMK), 2007 WL 273546, at *12 (S.D.N.Y. Jan. 31, 2007) ("the weight of Second Circuit precedent favors the view that a Plaintiff plead 'culpable participation' to state a section 20(a) claim, and that such participation must be plead with particularity"); *accord Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 246-47 (S.D.N.Y. 2006).

## <u>CONCLUSION</u>

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated:  January 18, 2008

Respectfully submitted,

<u>*s/ John M. Newman, Jr.*</u>
John M. Newman, Jr. (JN-5426)
Geoffrey J. Ritts (GR-4270)
Michael A. Platt (MP-7423)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
jmnewman@jonesday.com
gjritts@jonesday.com
maplatt@jonesday.com

Arthur J. Margulies (AM-7777)
JONES DAY
222 East 41st Street
New York, New York  10017-6702
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
ajmargulies@jonesday.com

*Attorneys for Macy's, Inc, Terry J. Lundgren, and Karen M. Hoguet*

-32-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 18, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

*s/ John M. Newman, Jr.*
John M. Newman, Jr.
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
jmnewman@jonesday.com

CLI-1579518

# Mailing Information for a Case 1:07-cv-04774-AKH

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Mario Alba , Jr**
  malba@csgrr.com,e_file_ny@csgrr.com,drosenfeld@csgrr.com

- **Ashley H. Kim**
  ashley@spornlaw.com

- **Arthur J. Margulies**
  ajmargulies@jonesday.com,dpjacobson@jonesday.com

- **John M. Newman , Jr**
  jmnewman@jonesday.com

- **Michael Alan Platt**
  maplatt@jonesday.com,pgarver@jonesday.com

- **Geoffrey J. Ritts**
  gjritts@jonesday.com

- **David Avi Rosenfeld**
  drosenfeld@csgrr.com,e_file_ny@csgrr.com,amartin@csgrr.com

- **Samuel Howard Rudman**
  srudman@csgrr.com,e_file_ny@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)