UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re MACY'S, INC. SECURITIES LITIGATION | : | Master File No. 1:07-cv-04774-AKH |
| | : | |
| | : | <u>CLASS ACTION</u> |
| | : | |
| This Document Relates To: | : | LEAD PLAINTIFF'S MEMORANDUM OF |
| | : | LAW IN OPPOSITION TO DEFENDANTS' |
| ALL ACTIONS. | : | MOTION TO DISMISS THE |
| | : | CONSOLIDATED AMENDED CLASS |
| | : | ACTION COMPLAINT |

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ...................................................................................1

II.   STATEMENT OF FACTS ........................................................................................4

    A.    The May Acquisition ...................................................................................4

    B.    Defendants Concealed Problems at the Former May Stores ...................................4

    C.    Defendants Sell $51 Million of Their Personally Held Stock Before the Truth Is Revealed ...................................................................................6

    D.    Macy's Reveals the Failure of the Re-Branding of the Former May Stores ...........7

III.  ARGUMENT .........................................................................................................9

    A.    Legal Standards on Motion to Dismiss ...............................................................9

    B.    The CAC Sufficiently Alleges Fraud with Particularity as Required Rule 9(b) and the PSLRA ...................................................................................10

    C.    The CAC Alleges Facts Giving Rise to a Strong Inference of Scienter ...............15

        1.    *Tellabs* Decision ...................................................................................15

        2.    The CAC's Allegations that Defendants Concealed the Problems at the Former May Stores so They Could Sell $51 Million of Their Stock Raises a Strong Inference of Fraud .................................................17

    D.    Defendants' Statements Are Not Protected by the Safe Harbor ...........................20

    E.    The CAC States a Claim Under Section 20(a) ....................................................23

IV.   CONCLUSION .....................................................................................................24

# TABLE OF AUTHORITIES

**Page**

## CASES

*ATSI Communs., Inc. v. Shaar Fund, Ltd.,*
  493 F.3d 87 (2nd Cir. 2007)...........................................................................................15

*Bell Atl. Corp. v. Twombly,*
  127 S. Ct. 1955 (2007)...................................................................................................10

*Caiola v. Citibank, N.A.,*
  295 F.3d 312 (2d Cir. 2002)...........................................................................................9

*Chill v. GE,*
  101 F.3d 263 (2d Cir. 1996)...........................................................................................16

*Cortec Indus., Inc. v. Sum Holding L.P.,*
  949 F. 2d 42, 48 (2d Cir. 1991)......................................................................................24

*Cosmas v. Hassett,*
  886 F.2d 8 (2d Cir. 1989)...............................................................................................17

*Ganino v. Citizens Utils. Co.,*
  228 F.3d 154 (2d Cir. 2000)....................................................................................*passim*

*In re Allaire Corp. Sec. Litig.,*
  224 F. Supp. 2d 319 (D. Mass. 2002).............................................................................13

*In re Am. Express Co. Sec. Litig.,*
  No. 02 Civ. 5533 (WHP), 2004 U.S. Dist. LEXIS 5497
  (S.D.N.Y. Mar. 31, 2004) ..............................................................................................21

*In re American Bank Note Holographics Sec. Litig.,*
  93 F. Supp. 2d 424 (S.D.N.Y. 2000) .............................................................................24

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.,*
  381 F. Supp. 2d 192 (S.D.N.Y. 2004) ...........................................................................21

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,*
  324 F. Supp. 2d 474 (S.D.N.Y. 2004) ...........................................................................13

*In re Biogen Sec. Litig.,*
  179 F.R.D. 25 (D. Mass. 1997) ......................................................................................8

**Page**

*In re Emex Corp. Sec. Litig.*,
    No. 01 Civ. 4886 (SWK), 2002 U.S. Dist. LEXIS 17528
    (S.D.N.Y. Sept. 18, 2002) ...............................................................23

*In re eSpeed, Inc. Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006) ...........................................20

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
    469 F. Supp. 2d 88 (S.D.N.Y. 2006) .............................................20

*In re IBM Corporate Sec. Litig.*,
    163 F.3d 102 (2d Cir. 1998) ............................................................21

*In re Initial Pub. Offering Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003) ...................................*passim*

*In re Mercator Software, Inc.*,
    161 F. Supp. 2d 143 (D. Conn. 2001) ..............................................9

*In re MTC Elec. Techs. S'holders Litig.*,
    898 F. Supp. 974 (E.D.N.Y. 1995) .................................................18

*In re Nortel Networks Corp. Sec. Litig.*,
    238 F. Supp. 2d 613 (S.D.N.Y. 2003) ...........................................22

*In re NTL, Inc. Sec. Litig.*,
    347 F. Supp. 2d 15 (S.D.N.Y. 2004) .............................................10

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) ........................................18, 20, 21

*In re PE Corp. Sec. Litig.*,
    228 F.R.D. 102 (D. Conn. 2005) ......................................................8

*In re Regeneron Pharms., Inc. Sec. Litig.*,
    03 Civ. 3111 (RWS), 2005 U.S. Dist. LEXIS 1350
    (S.D.N.Y. Feb. 3, 2005) ...................................................10, 21, 23

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) ..................................10, 11, 13, 18

*In re Tower Auto. Sec. Litig.*,
    483 F. Supp. 2d 327 (S.D.N.Y. 2007) ..................................23, 24

**Page**

*In re Van Der Moolen Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005) .................................................... 23, 24

*In re Vivendi Universal, S.A. Sec. Litig.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003) .......................................................... 22

*In re Vivendi Universal, S.A. Sec. Litig.*,
  No. 02 Civ. 5571 (RJH), 2004 U.S. Dist. LEXIS 7015
  (S.D.N.Y. April 22, 2004) ........................................................................ 8, 14

*In re WorldCom, Inc. Sec. Litig.*,
  294 F. Supp. 2d 392 (S.D.N.Y. 2003) .......................................................... 23

*Irvine v. ImClone Sys.*,
  No. 02 Civ. 109 (RO), 2003 U.S. Dist. LEXIS 9342
  (S.D.N.Y. June 4, 2003)......................................................................... 16, 22

*Mills v. Polar Molecular Corp.*,
  12 F.3d 1170 (2d Cir. 1993)......................................................................... 10

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000).................................................................. *passim*

*Ouaknine v. MacFarlane*,
  897 F.2d 75 (2d Cir. 1990).......................................................................... 10

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000).......................................................................... 14

*Rubin v. Trimble*,
  No. C-95-4353 MMC, 1997 U.S. Dist. LEXIS 14011
  (N.D. Cal. April 28, 1997) ............................................................................ 8

*Ruskin v. TIG Holdings, Inc.*,
  No. 98 Civ. 1068 (LLS), 2000 U.S. Dist. LEXIS 11517
  (S.D.N.Y. Aug. 14, 2000) ............................................................................ 23

*Scheuer v. Rhodes*,
  416 U.S. 232 (1974) ................................................................................ 9, 13

*Schnall v. Annuity & Life Re (Holdings), Ltd.*,
  No. 02 Civ. 2133, 2004 U.S. Dist. LEXIS 1601
  (D. Conn. Feb. 4, 2004) .............................................................................. 13

Page

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank,*
   250 F.3d 87 (2d Cir. 2001) ..........................................................................................24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   127 S. Ct. 2499 (2007) ..........................................................................................15, 16

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
   §78u-4 ..........................................................................................9, 10, 16
   §78u-5 ..........................................................................................21, 22, 23
   §78(t) ..........................................................................................23

Exchange Act ..........................................................................................8, 16, 23

Private Securities Litigation Reform Act of 1995 ..........................................................*passim*

Securities Exchange Act of 1934 ..........................................................................................1
   §10(b) ..........................................................................................15, 16, 21

## RULES

Federal Rules of Civil Procedure
   8 ..........................................................................................10, 23, 24
   9(b) ..........................................................................................10, 11, 15, 16
   12(b) ..........................................................................................9, 10, 15, 16

Lead Plaintiff Pinellas Park Retirement System (General Employees) ("Lead Plaintiff" or "Plaintiff") respectfully submit this memorandum of law in opposition to Defendants Macy's Inc. ("Macy's" or the "Company"), Terry J. Lundgren ("Lundgren") and Karen M. Hoguet ("Hoguet") ("Individual Defendants") motion to dismiss (hereinafter referred to as "Def. Mem. at ___") the Consolidated Amended Complaint, dated November 19, 2007 (the "CAC").

## I.    PRELIMINARY STATEMENT

This is a federal securities class action on behalf of purchasers of Macy's publicly traded securities during the period February 8, 2007 to May 15, 2007 (the "Class Period"), against Macy's and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

Defendant Macy's is the second-largest U.S. department store franchise, operates more than 850 department stores in 45 states, the District of Columbia, Guam and Puerto Rico under the names of Macy's and Bloomingdale's.  This case concerns Macy's acquisition and integration of May Department Stores Co. ("May") and the re-branding of the former May stores to Macy's stores. Macy's acquired May in August 2005 and by the start of the Class Period, the Company had re-branded the former May stores and for the first time would be including the results from those stores in its all important same-store sales figures.

Unbeknownst to investors, Macy's re-branding of the former May stores had caused a dramatic slowdown in sales at those stores as customers had reacted negatively to the cessation of coupons and promotional events that May had historically done.  By the start of the Class Period, Defendants were representing that sales trends at the former May stores were improving (¶28)[1] and

---

[1]    "¶___" refers to the paragraphs of the CAC.

that same-store sales for March and April would increase 2.5 to 4 percent. ¶30. In other words, the Company's re-branding efforts were meeting with success. When same-store sales figures for March missed Defendants' estimate they blamed it on "unseasonably cold weather," continued to conceal the problems at the former May stores and repeated the representation that same-store sales for April would increase 2.5 to 4 percent. ¶32. Finally, Defendants were unable to "pull the rabbit out of the hat" and were forced to report that the same-store sales for April had declined 2.2% and that "sales in the new Macy's locations were disappointing in the quarter." In response to these announcements, the price of Macy's stock declined to $38.76 per share, a decline of $7.94 per share from the Class Period high of $46.70 per share reached on March 23, 2007. After the Class Period, Macy's continued to report declining same store sales figures and news reports have blamed the Company's sales problems on the former May stores.[2] This puts the lie to Defendants' contention that the problems cited to in the CAC are nothing more than a "routine business hiccup." Def. Mem. at 1. In truth and in fact, the May acquisition has been disastrous for the Company and it is still recovering from the negative effects of the acquisition.

Defendants delayed disclosing the truth so they could sell more than $51 million of their personally-held Macy's stock to the unsuspecting public. These sales were unusual and suspicious. Defendant Lundgren sold 57% of his personally-held Macy's common stock and Defendant Hoguet sold 47% of her personally-held Macy's common stock. The stock sales followed Defendants'

---

[2]     Macy's same-store sales figures were reported as follows: May -3.3 %, June -2.7%, July -1.4%, Aug. +2.4%, Sep. -2.7% and Oct. -1.5%. *See* Declaration of Russell J. Gunyan In Support of Lead Plaintiff's Memorandum Of Law In Opposition To Defendants' Motion To Dismiss The Consolidated Amended Class Action Complaint, dated March 7, 2008 (hereinafter referred to as "Gunyan Decl. at Ex. ___") Ex. 1. Thus, five of the six months following the Class Period, Macy's reported declining same-store sales. News reports have also noted that the May acquisition has been largely responsible for the sales issues that the Company has been experiencing. *See* ¶40 (*New York Times News Service* article detailing problems with May acquisition.).

positive statements about "improving" sales trends and same-store sales growth of 2.5 to 4 percent. Furthermore, the insider selling spree commenced three (3) days after Macy's completed a buy-back of 45 million shares of common stock and three (3) weeks before the bad news was revealed. Thus, Defendants were lining their pockets after having used corporate funds to pump up the price of Macy's stock and jumped ship before the bad news came out. Classic insider trading.

Defendants' motion to dismiss primarily contends that Plaintiff has failed to allege fraud with particularity by not providing as much evidentiary material as Defendants might like, equating the case to "fraud-by-hindsight." The CAC, however, adequately particularizes its allegations of fraud by citing to Defendants' admissions and other detailed allegations. This is not "fraud-by-hindsight" although the admissions were made at the end of the Class Period (as virtually any admission in a securities fraud case would be). Defendants have admitted that sales at the former May stores were negatively impacted by the cessation of promotional activity and have admitted that during February and March sales at the former May stores was weak. Indeed, at the end of the Class Period Defendant Hoguet admitted that "in February and March, the weakness was focused on the new Macy's or the former May doors." These admissions, coupled with Defendants' unusual and suspicious insider trading and the other allegations of the CAC, adequately support Plaintiff's allegations of fraud and raise more than a strong inference of scienter. Defendants' explanations and justifications for their conduct, which are strewn throughout their brief, are not appropriate for consideration on this motion and will have to wait for summary judgment.

For the reasons set forth herein, it is respectfully submitted that Defendants' motion to dismiss should be denied in its entirety and this case should proceed to discovery.

II.    **STATEMENT OF FACTS**[3]

    A.    **The May Acquisition**

On August 30, 2005, Macy's completed the acquisition of May.  ¶¶3 and 15.  The acquired May operations included approximately 500 department stores operating under the names Famous-Barr, Filene's, Foley's, Hecht's, Kaufmann's, Lord & Taylor, L.S. Ayres, Marshall Field's, Meier & Frank, Robinsons-May, Strawbridge's, and The Jones Store.  Following the acquisition, Macy's operations more than doubled in size to include approximately 850 department stores covering seven geographic regions.  ¶15.

During September 2005, Macy's released information concerning the planned integration of May and Macy's operations.  In February 2006, Macy's planned to realign its geographic divisions to include the acquired May stores.  In March 2006, the Company planned to begin phasing-out May centralized functions and corporate offices.  By the Fall of 2006, the Company planned to rename all of the retained May stores, including Marshal Field's, operating under regional names to the "Macy's" brand.  ¶17.  Throughout 2006, Defendants repeatedly reported that the May integration was proceeding as planned and was "on track."  ¶¶17 and 18.  The integration of May/Macy's operations was substantially complete by February 2007.  ¶19.

    B.    **Defendants Concealed Problems at the Former May Stores**

By the start of the Class Period, unbeknownst to investors, the re-branding of the May company stores was not meeting with success and the Company was losing May's traditional client base by dramatically changing the marketing and promotional activity at converted May stores.  As a result, sales at the former May stores were dramatically declining.  When sales figures from the

---

[3]    The Statement of Facts is drawn from the allegations of the CAC.

former May stores were included in Macy's same-store sales figures, as they were in February 2007, those figures were negatively impacted.  ¶20.

In September 2006, Defendants changed the name of May stores to Macy's and, at the same time, eliminated the promotional and marketing activity that had been historically employed at May. In particular, Defendants substantially eliminated the coupon-based promotional activity employed by May in favor of credit card promotions.  In conjunction with the cessation of coupon promotions, the Company substantially upgraded the inventory at converted May stores to bring it more in line with Macy's.  These changes were not well received by customers and sales at former May stores dramatically declined from historic levels.  ¶21.

Defendants knew this would happen because they had been told by a consultant they had hired that the cessation of coupon promotions and the re-branding of May stores would cause a substantial disruption to the sales activity at converted May stores.  Beginning in late 2004, while the acquisition of May was agreed to but not yet consummated, Macy's began conducting substantial market research, which included implementing a series of customer surveys and focus groups, in order to better predict the reaction of former May customers with regard to the re-branding and change in promotional activity.  In connection with the market research, Macy's retained Lowe New York ("Lowe"), a New-York based advertising agency.  ¶22.

The findings of the market research were compiled by Lowe and presented to Macy's senior management in a highly detailed and lengthy study report (the "Lowe Report").  The Lowe Report indicated that there would be a significant customer backlash as a result of the nationwide re-branding, store make-overs and marketing transition away from promotional events and coupons. ¶23.

- 5 -

C.    **Defendants Sell $51 Million of Their Personally Held Stock Before the Truth Is Revealed**

Throughout the Class Period, the price of Macy's stock continued to increase as the Company reported positive operating trends. By March 23, 2007, the price of Macy's stock had increased to $46.70 per share – the Class Period high – representing more than a 14% increase from the start of the Class Period. Yet, Defendants knew what the market did not - - the re-branding of the former May Stores was not being well received and was causing a substantial slow-down in sales and would negatively impact the Company's same-store sales figures - - a key operating metric looked at by investors and analysts. Then, with Macy's stock trading at inflated levels, Defendants Lundgren and Hoguet and other Macy's insiders dumped 1.1 million shares of their personally-held Macy's common stock at or near Class Period high prices generating proceeds of $51.4 million. ¶5.

Defendants' insider sales were unusual and suspicious in timing and amount. As set forth in the CAC, the Individual Defendants' sales were unusual in amount because both Lundgren and Houget sold a high percentage of the Macy's shares they directly or beneficially owned during the Class Period. Specifically, Defendant Lundgren sold 57% of his personally-held Macy's common stock during the Class Period. Similarly, Defendant Hoguet sold 47% of her personally-held Macy's common stock. Moreover, these individuals did not sell any shares of Macy's common stock during the previous twelve months. ¶44.

The sales by the Individual Defendants and other Macy's insiders were also suspicious in timing. The sales commenced on March 2, 2007, 3 days after the Company's February 27, 2007 repurchase of 45 million shares of its common stock. Thus, while Defendant Hoguet publicly represented during a fourth quarter of 2006 earnings conference call that the repurchase represented a "great investment" for the Company presumably because of the stock's purported undervaluation by the market, insiders were planning to sell, and succeeded in selling, more than 1.1 million shares

at prices artificially inflated by Defendants' repeated misrepresentations that positive sales trends reported for fourth quarter of 2006 were continuing through first quarter of 2007. ¶¶37 and 44.

All of the insider transactions identified in the CAC were executed in a price range of $44.00(+) per share to $46.00(+) per share, at or near the Class Period high of $46.70 per share reached on March 23, 2007. The massive sales by Macy's insiders began on March 2, 2007, continued unabated through April 18, 2007, just 22 days prior to Macy's devastating May 10, 2007 announcement that April 2007 comp-store sales had in fact declined. Defendant Lundgren's sales of 279,420 shares were executed on March 22, 2007 for prices ranging from $46.00 per share to $46.37 per share. ¶44.

**D.    Macy's Reveals the Failure of the Re-Branding of the Former May Stores**

In a series of announcements beginning on May 10, 2007, Macy's revealed to the market the failure of the Company's strategy to shift promotional activities at the re-branded May stores away from coupon-based sales events. On May 10, 2007, Defendants shocked the market by revealing first that the Company's April same-store sales declined down 2.2% compared to the prior year. ¶34. Lundgren stated that "April sales were disappointing across the country in both new and legacy Macy's stores" and that a "major promotional event that was shifted from May last year to April this year did not produce the results we expected." The Company's release also stated that the Company expected same-store sales in May 2007 "to be in the range of flat to down 2 percent, which reflects the promotional event shift from May into April." ¶34. In response to this announcement, the price of Macy's stock declined from $43.48 per share to $41.78 per share on extremely heavy trading

volume. ¶35.[4] Defendants further revealed that customers of the former May stores had rejected the rapid conversion, that sales at the Company's new Macy's stores had declined during the first quarter of 2007, and that, in particular, the Company's decision to dramatically cut the number of coupon days that could be used at the former May locations had badly damaged sales. "'By cutting back as hard as we did, we clearly hurt the business,'" Defendant Hoguet stated on May 14, 2007. ¶37.[5]

Then, on May 16, 2007, before the market opened, the Company issued a press release entitled "Federated Reports First Quarter Earnings of 11 Cents Per Diluted Share from Continuing Operations, up from a Loss of 13 Cents Per Diluted Share Last Year; Diluted EPS is 16 Cents, Excluding Merger Integration Costs." The release quoted Lundgren as stating that "sales in the new Macy's locations were disappointing in the quarter." ¶36. During a conference call with financial analysts, on May 16, 2007, Hoguet directly contradicted Defendants' previous representations that

---

[4]    Defendants' contend that this price decline is not significant enough to allege a claim under the Exchange Act. Def. Mem. at 6. Defendants, however, do not cite any cases supporting this position and have not argued that the CAC does not sufficiently allege loss causation. To the extent Defendants are arguing that the problems cited by Plaintiff are not material, they are wrong. Aside from the fact that materiality is a factual issue, investors would have found the alleged omitted facts material.

[5]    Due to a typographical error the date of this statement in the CAC is incorrect. The correct date is May 16, 2007. In addition, Defendants attempt to raise a "truth on the market defense" by arguing that Hoguet's statement was disclosed prior to May 16, 2007 during a Bank of American Investors Conference. Def. Mem. at 16 fn. 9. However, the Second Circuit has cautioned that truth on the market is intensely fact specific and rarely and appropriate basis for a motion to dismiss. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000); *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571 (RJH), 2004 U.S. Dist. LEXIS 7015, at *16 (S.D.N.Y. April 22, 2004); *see also In re PE Corp. Sec. Litig.*, 228 F.R.D. 102, 111 (D. Conn. 2005) ("'as the truth-on-the-market defense raises factual issues, it is generally a question for summary judgment or trial'"); *Rubin v. Trimble*, No. C-95-4353 MMC, 1997 U.S. Dist. LEXIS 14011 (N.D. Cal. April 28, 1997) (same); *In re Biogen Sec. Litig.*, 179 F.R.D. 25, 37 (D. Mass. 1997) (determination of truth on market defense is fact intensive and, therefore, the defendants have an onerous burden on *summary judgment*.).

February 2007 sales at former May stores had continued to improve over fourth quarter of 2006 sales results.  ¶37.

On September 30, 2007, in an article published by the *New York Times News Service*, Lundgren admitted that abruptly curtailing discounts like coupons was Macy's biggest misstep, contributing to four consecutive months of falling store sales this spring.  Macy's stock has dropped more than 40 percent since it bought the May stores.  Mr. Lundgren said his plan "will take longer than we had planned or expected," adding that "the strategy is crystal clear, and I know we are on the right track."  ¶40.[6]

## III.    ARGUMENT

### A.    Legal Standards on Motion to Dismiss

Defendants have a heavy burden on this motion to dismiss, as they must demonstrate that the Plaintiffs either failed to state claims as a matter of law under Rule 12(b)(6) or did not properly plead those claims under the Federal Rules of Civil Procedure or the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §78u-4, *et seq.*

In reviewing a motion to dismiss, the Court must presume that the allegations of the CAC are true, read the CAC as a whole, and give Plaintiffs the benefit of every favorable inference that can be drawn from its allegations.  *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *see also Caiola v. Citibank, N.A.*, 295 F.3d 312 (2d Cir. 2002); *Ganino*, 228 F.3d at 161; *In re Mercator Software, Inc.*, 161 F. Supp. 2d 143, 150 (D. Conn. 2001) (noting that all allegations must be read in their totality, not in isolation).  The PSLRA "do[es] not change the standard of review for a motion to dismiss." *In*

---

[6]    Defendants go to great lengths to argue that Macy's did not announce bad news at the end of the Class Period.  *See, e.g.,* Def. Mem. at 7.  This is inapposite factual disposition aside from being wrong.

*re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 332 (S.D.N.Y. 2003) ("IPO") (emphasis added); *Novak v. Kasaks*, 216 F.3d 300, 309-11 (2d Cir. 2000). Furthermore, a complaint "attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," but rather must simply provide the grounds of entitlement to relief and raise a right to relief above the speculative level. *Bell Atl. Corp. v. Twombly,* 127 S. Ct. 1955, 1959 (2007) (citations omitted). As detailed below, the CAC easily meets this standard.

### B.    The CAC Sufficiently Alleges Fraud with Particularity as Required Rule 9(b) and the PSLRA

Securities fraud actions are subject to the pleading requirements of the PSLRA and Rule 9(b), which requires plaintiffs to identify "with particularity" the circumstances constituting the alleged fraud. Fed. R. Civ. P. 9(b). "To satisfy Rule 9(b), the complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *In re Regeneron Pharms., Inc. Sec. Litig.*, 03 Civ. 3111 (RWS), 2005 U.S. Dist. LEXIS 1350, at *34-*35 (S.D.N.Y. Feb. 3, 2005) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)). Rule 8's general pleading requirement and Rule 9(b)'s particularity requirement must be read together. *See Ouaknine v. MacFarlane*, 897 F.2d 75, 79 (2d Cir. 1990). The Second Circuit has stated that it does "not require the pleading of detailed evidentiary matter in securities litigation," *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001), and Courts of this district have stated consistently that "the application of Rule 9(b) . . . must not abrogate the concept of notice pleading." *IPO*, 241 F. Supp. 2d 281, 327 (S.D.N.Y. 2003).

Additionally, the PSLRA requires that an allegation made on information and belief "shall state with particularity all facts on which that belief is formed." 15 U.S.C. §78u-4(b)(1); *see In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 22 (S.D.N.Y. 2004) (the standard is satisfied where

plaintiffs "plead with particularity sufficient facts to support [the alleged] beliefs.") (quoting *Novak*, 216 F.3d at 313-14). Although the level of particularity necessary to meet this standard will vary from case to case, the critical threshold is that the court should be satisfied that the charge of fraud is not "unwarranted." *IPO*, 241 F. Supp. 2d at 358. As discussed below, the CAC easily satisfies the applicable pleading standard.

Here, Plaintiff sufficiently alleges that Defendants made materially false and misleading statements and omitted material information concerning the failed re-branding of the former May stores and declining sales at the stores. The CAC has adequately alleged the "who, what, when, where" and "how" of Defendants' fraudulent conduct. The CAC specifically identifies "what" statements were materially false and misleading and "when" they were made (*i.e.*, Macy's press releases, SEC filings, and other public statements (*see* ¶¶25, 27, 28, 30 and 32)) and "who" made the statements. *Id.* Additionally, the CAC sufficiently alleges "why" the statements were materially false and misleading, *i.e.*, that the Company's re-branding of the former May stores was being rejected by customers and sales at former May store locations were declining from historic levels and would continue to do so. *See* ¶¶20-24, 26, 29, 31 and 33.

Defendants contend that the CAC lacks particularity because it "does not identify internal projections . . . alleges no facts suggesting anyone told defendants that the first-quarter projections could not be met . . . contains no allegations that defendant themselves made any private statements at odds with the first-quarter projections . . . contains nothing about the process of formulating the projections." Def. Mem. at 11-12. In essence, Defendants are demanding that Plaintiff plead evidence which is not required. *See Scholastic*, 252 F. 3d at 72 ("Even with the heightened pleading standard under Rule 9(b) and the Securities Reform Act we do not require the pleading of detailed evidentiary matter in securities litigation.")

- 11 -

Despite Defendants' protestations, the CAC sufficiently supports its allegations of fraud by citing to Defendants' admissions and other allegations. Defendants have admitted that sales at the former May stores declined substantially after the Company ceased coupon promotions. The CAC further pleads that Defendants knew that this would happen when they stopped the coupon promotions because Macy's had hired a consultant who studied the matter and provided the Company with a report that concluded that the cessation of coupon promotions would cause a decline in sales. ¶¶22-24. Moreover, the CAC relies on Defendant Hoguet's admission that "in February and March, the weakness was focused on the new Macy's or the former May doors." ¶37. These admissions provide a sufficient basis to allege that Defendants knew during the Class Period that the re-branding at the former May stores was failing and sales at those stores was declining. When the allegations of the CAC are considered together, in context and drawing all inferences in Plaintiff's favor, Plaintiff has sufficiently alleged a basis for its allegation that during the Class Period sales at the former May stores was declining because of the cessation of coupon promotions and was negatively impacting the Company's same-store sales figures. *See Novak*, 216 F. 3d at 312-13 (holding that allegations that inventory was overvalued during the Class Period were sufficiently particular because after the Class Period Defendants admitted to analysts that inventories were too high, admitted in a SEC filing that the decrease in gross margin was attributable to markdowns and six months after the Class Period admitted that the Company still had substantial dated inventory).[7]

---

[7]    Defendants' admissions provide the detail that Defendants demand. Why does Plaintiff need to plead "internal projections," "private statements," communications where someone "told defendants that the first-quarter projections could not be met . . ." or any other of the detail argued for by Defendants when Defendants have admitted that "in February and March, the weakness was focused on the new Macy's or the former May doors."

Defendants' efforts to discredit these allegations are unavailing. First, Defendants erroneously contend that Plaintiff has alleged "fraud-by-hindsight." Def. Mem. at 9-13. Plaintiff here relies on Defendants' own contradictory statements relating to Macy's sales in the February and March periods of 2007 as evidence that their original statements concerning these sales were false.[8] Plaintiff does not contend that Defendants' statements proved to be overly optimistic in light of subsequent events. Def. Mem. at 10. Plaintiff does contend that Defendants failed to take into account information that was available to them when Macy's February and March sales results were issued. This clearly removes the case from the realm of "fraud by hindsight." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 494 (S.D.N.Y. 2004); *Schnall v. Annuity & Life Re (Holdings), Ltd.*, No. 02 Civ. 2133, 2004 U.S. Dist. LEXIS 1601 (D. Conn. Feb. 4, 2004) (Defendant had a duty to exercise a certain level of care when making financial disclosures that were statements about past performance as to which defendant had knowledge or should have had knowledge); *see also In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 328 (D. Mass. 2002) (rejecting defendant's argument of fraud by hindsight).

Furthermore, the fact that Plaintiff has relied on admissions that were made at the end of the Class Period or after does not mean that the CAC is based on hindsight. *See Novak*, 216 F. 3d at 312; *Scholastic*, 252 F. 3d at 72 ("Any information that sheds light on whether class period

---

[8]    The statement by Hoguet on February 27, 2007 that comparative sales trends at the former May stores has been improving since mid December 2006 and that this trend was continuing through February 2007 (*see* ¶28) is directly contradicted by at least two of Defendants' subsequent statements concerning Macy's February sales. First by Lundgren's statement on May 16, 2007 that "sales in the new Macy's locations were disappointing in the [February, March, April]quarter" (¶36) and then by Hoguet's comments to analysts on May 16, 2007 that "in February and March, the weakness was focused on the new Macy's or the former May doors." ¶37. Defendants also argue that the Court should draw inferences in their favor based on the facts alleged in the CAC. *See* Def. Mem. at 13. This is clearly impermissible on a motion to dismiss. *Scheuer*, 416 U.S. at 236.

statements were false or materially misleading is relevant."); *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000); *Vivendi*, 2004 U.S. Dist. LEXIS 7015, at *22 (noting that the "Second Circuit has explicitly recognized that plaintiffs may reply on post-class period data to confirm what a defendant should have known during the class period.") Defendants' admissions shed light on what they knew about the sales at the former May stores during the Class Period and the other post-Class Period information further details what Defendants knew or should have known during the Class Period.

Similarly, Defendants attempt to explain away Defendants' admissions by contending that Defendants disclosed the problems at the former May stores during the Class Period. Def. Mem. at 13-14. Defendants cite to several excerpts from an "analyst call" on February 27, 2007 (¶28). None of these statements, however, disclose that sales at the former May stores were in decline and that the cessation of coupon promotions was to blame. In fact, a fair reading of the statements is that Defendants were attempting to create the impression that the sales weakness at the former May stores was limited to the fourth quarter of 2006 and that sales trends were improving, *i.e.,* the re-branding was beginning to work and sales were trending positively. *See* Def. Mem. at 14. ("The trend is definitely improving and we feel good about our ability to deliver the expected 2% to 3.5% Mays store sales increase in 2007," "it's important to note that the trend in [those] stores has improved," "the trend has been improving since mid December . . ."). Moreover, to the extent that Defendants are arguing that the truth was in the market, that defense is not appropriate for resolution on a motion to dismiss. *See Ganino*, 228 F. 3d at 167; *Vivendi*, 2004 U.S. Dist. LEXIS 5571, at *16.

In sum, for the reasons set forth herein, the CAC sufficiently particularizes its allegations of fraud.

C.    **The CAC Alleges Facts Giving Rise to a Strong Inference of Scienter**

1.    ***Tellabs* Decision**

In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) ("*Tellabs*") the United States Supreme Court articulated the standard that courts must now apply in determining whether a plaintiff has pleaded a "strong inference of scienter" as required by the Private Securities Litigation Reform Act of 1995. The Supreme Court "establish[ed] the following prescriptions:

> First, faced with a Rule 12(b) motion to dismiss a §10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true. . . . Second, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss. . . . Third, in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences.

*Id.* at 2509. In determining the adequacy of scienter, the Court reiterated that "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 2511. Considering each of these factors, the Court adopted the following standard, "[w]hen the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* Furthermore, the Court refused to adopt the more stringent standard supported by Defendants, holding instead that the "inference that the defendants acted with scienter need not be irrefutable . . . or even the 'most plausible of competing interests.'" *Id.* at 2510 (internal quotation and citations omitted).

While the Second Circuit has equated its "strong inference" requirement under Rule 9(b) with that contained in the PSLRA, *see, e.g.*, *Novak*, 216 F.3d at 309-10 (2d Cir. 2000), it has not addressed the issue of the impact the PSLRA or Rule 9(b) have on the inferences permissible on a motion to dismiss. However, the Second Circuit has never proscribed the evaluation of competing inferences of scienter as an improper usurpation of the jury's role. The *Tellabs* decision, therefore, will have little practical effect on the determination of scienter in Second Circuit cases. *See ATSI*

- 15 -

*Communs., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2nd Cir. 2007) (holding that scienter plead by showing either motive and opportunity or circumstantial evidence of recklessness and that to determine an inference to be "strong," a "reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference that can be drawn from the facts alleged.); *Chill v. GE*, 101 F.3d 263, 268, n. 7 (2d Cir. 1996) ("The plaintiffs argue that the district court, in dismissing their amended complaint, improperly undertook the role of a jury when it evaluated competing inferences to find that GE's actions were not reckless but instead 'mismanagement at most.' We do not accept this argument. The district court found that the plaintiffs' allegations failed to meet the standards in Fed. R. Civ. P. 9(b) and 12(b)(6). In doing so, the court simply refused to credit plaintiffs' argument that an inference of recklessness rationally could be made.")

Under the PSLRA, a complaint alleging violations of Section 10(b) of the Exchange Act must state "facts giving rise to a strong inference that the Defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2). *Tellabs* did not alter this Circuit's analysis that a plaintiff may establish a "strong inference" of scienter either: (i) by alleging facts which demonstrate that defendants had both motive and opportunity to commit fraud; or (ii) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Ganino*, 228 F.3d at 170; *see also Irvine v. ImClone Sys.*, No. 02 Civ. 109 (RO), 2003 U.S. Dist. LEXIS 9342, at *6 -*7 (S.D.N.Y. June 4, 2003).

In assessing whether the allegations of the CAC give rise to a strong inference of scienter, the Court should not consider the CAC's allegations in isolation, but rather "collectively," "holistically" and **not** in isolation. *Tellabs* at 2511. Although more than conclusory allegations are needed to meet the scienter requirement, the Second Circuit does not require "'great specificity' provided the

plaintiff alleges enough facts to support a 'strong inference of fraudulent intent.'" *Ganino*, 228 F.3d at 169.

> **2.    The CAC's Allegations that Defendants Concealed the Problems at the Former May Stores so They Could Sell $51 Million of Their Stock Raises a Strong Inference of Fraud**

The CAC alleges a compelling fraud. Defendants concealed the problems at the former May stores during the Class Period so that they could sell $51 million of their personally-held Macy's stock to the unsuspecting public. The CAC details how the Company's re-branding efforts had negatively impacted sales at the former May stores and how this decline was known to Defendants. ¶¶20-24 and 37. Indeed, Defendants cannot credibly deny that they knew, or were reckless in not knowing, about the re-branding of the former May stores and the issues being encountered by those stores as the May acquisition was the most significant corporate event for the Company in its recent history.[9] *See Cosmas v. Hassett*, 886 F.2d 8,13 (2d Cir. 1989) (holding that directors are imputed with knowledge of the removal of a "potentially significant source of income for the company").

The CAC further alleges that Defendants have admitted that they knew that sales were weak at the former May stores in February and March while at the same time representing to investors that sales trends at the former May stores were improving (¶28) and that the Company would experience same-stores sales growth for March and April of between 2.5 and 4 percent. ¶30. This sufficiently alleges recklessness as the CAC alleges that Defendants were in possession of facts that contradicted their public statements. *See Novak*, 216 F.3d at 308 ("[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants'

---

[9]    Furthermore, Defendants had been forewarned of the risks of the re-branding program by the Lowe Report ¶¶20-24. Given their knowledge of Lowe Report's findings, Defendants were reckless in issuing numerous positive statements about converted May stores sales results without disclosing the known risks of the elimination of coupon-based promotions.

knowledge of facts or access to information contradicting their public statements.   Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.").

Furthermore, Defendants had a strong financial motive to delay disclosing the problems at the former May stores for the three-month Class Period – insider selling.  As detailed in the CAC, the Company's highest-level executives, including the Individual Defendants collectively sold approximately $51.4 million worth of their personal holdings in the Company at suspicious times.  It is noteworthy that more than $32 million of the overall sales alleged in the CAC took place on the heels of Macy's "accelerated" common stock repurchase and just weeks before the close of the Class Period.  ¶¶7 and 45; *see In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) ("*Oxford*") (holding that "[t]rades made a short time before a negative public announcement are suspiciously timed").  Ten (10) high level Macy's executives sold stock during the same time period.  Defendant Lundgren sold 57% of his stock holdings and Defendant Hoguet sold 47% of her stock holdings.  *See Oxford*, 187 F.R.D. at 140 (holding that stock sales were suspicious where certain insiders separately sold between $621,000 and $5.4 million worth of stock); *IPO*, 241 F. Supp. 2d at 365-66 (insider sold "hundreds of thousands of dollars worth of inflated stock"); *In re MTC Elec. Techs. S'holders Litig.*, 898 F. Supp. 974, 980 (E.D.N.Y. 1995) (defendant sold almost 8,000 shares for profits of $173,000).  The suspicious timing of the sales, the amount of the sales, the percentage of the holdings sold and the number of Macy's insiders clearly support and add to the strong inference of fraud portrayed in the CAC.  *See Scholastic*, 252 F.3d at 74-75 (holding that courts should consider several factors to determine whether insider trading activity is unusual, including "the amount of profit from the sales, the portion of the stockholdings sold, the change in volume of insider sales, and the number of insiders selling").

- 18 -

Defendants argue that the CAC fails to sufficiently allege scienter because, in their view, Plaintiff has not sufficiently alleged conscious misbehavior or recklessness and has not sufficiently alleged motive and opportunity. Def. Mem. at 17-27. With respect to conscious misbehavior, Defendants ignore the allegations of the CAC and contend that Plaintiff has sought to allege recklessness by citing to Defendants' positions at the Company or generic internal reports. Def. Mem. 19-20. The CAC, however, relies on Defendants' admissions as well as other allegations, delineated above, to allege recklessness and does not simply rely on general boilerplate allegations.[10]

With respect to the CAC's insider trading allegations, Defendants go to extraordinary lengths in an attempt to convince the Court that $51 million of insider selling by ten (10) Macy's executives weeks before the disclosure of negative news is not probative of scienter. As an initial matter, Defendants ignore the selling of 8 out of the 10 insider traders by relegating discussion of these traders to a footnote. Despite Defendants' apparent lack of interest in these allegations, the fact that ten (10) Macy's executives all sold stock in significant amounts at the same time supports a strong inference that they were aware of negative information.

The bulk of Defendants' attack is directed to their efforts to water down Defendant Lundgren's and Defendant Hoguet's sales. In this regard, Defendants argue that the Court should disregard the fact that Defendant Lundgren sold 57% of his stock holdings and Defendant Hoguet sold 47% of her holdings because the Court should consider their vested options in calculating the percentage of their holdings sold. In other words, Defendants' view insider trading is only probative of scienter if the insider seller liquidates all common stock and vested options. This is ridiculous.

---

[10]    For this reason, Defendants' authorities concerning the insufficiency of scienter allegations based solely on one's position or review of unspecified reports are inapposite. Def. Mem. at 19-20.

Many courts in this District have rejected Defendants' position that vested options are to be considered in calculating the percentage of holdings sold and the Second Circuit has not issued an opinion on the issue. *See In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 100 (S.D.N.Y. 2006); *Oxford*, 187 F.R.D. at 140 (vested options are not shares); *but see In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266 (S.D.N.Y. 2006) (vested stock options should be counted as shares). These opinions correctly review the alleged insider trading in context to determine whether the alleged insider sales raise the requisite strong inference of scienter.

Finally, Defendants argue that the timing of their insider sales was not suspicious because Macy's had just completed a buy-back of shares and Defendants Lundgren and Hoguet sold stock they acquired from options that were set to expire in March 2008 (one year from their insider sales). Macy's buy-back, however, further supports the strong inference of scienter as Defendants used corporate funds to prop up the price of Macy's stock so that they could sell in the market at inflated prices. Similarly, Defendants' option expiration argument cuts against them as well as it actually supports Plaintiff's allegations. Indeed, given the problems at the Company, Defendants knew that they would have to sell their stock as soon as possible as the Company's sales results would continue to suffer as the Company worked through the problems with the May acquisition. Thus, the Class Period was the most advantageous time to sell their stock. Since the close of the Class Period, Macy's stock has continued to decline closing at $23.54 per share on March 6, 2008.

### D.    Defendants' Statements Are Not Protected by the Safe Harbor

Defendants also seek dismissal arguing that their statements are protected under the PSLRA's Safe Harbor Doctrine for forward-looking statements. Def. Mem. at 27-31. As an initial matter, many of the alleged false and misleading statements cannot be characterized as forward looking. *See* ¶¶25 and 28.

- 20 -

Even assuming that some of the statements that Defendants made are forward-looking in nature, those statements are not protected by the PSLRA's safe harbor provision as demonstrated above, Defendants knew that the statements were false and misleading at the time they were made. *See In re IBM Corporate Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (holding that "[s]tatements regarding projections of future performance may be actionable under Section 10(b) or Rule 10b-5 if they are worded as guarantees or are supported by specific statements of fact . . . or if the speaker does not genuinely or reasonably believe them"); *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 223 (S.D.N.Y. 2004) (holding that "'no degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made'"); *see also Oxford*, 187 F.R.D. at 141 (holding that statements may be actionable if they are made without any basis or if "the speakers were aware of any facts undermining the accuracy of these statements").

A warning that fails to disclose specific known facts is insufficiently precise and will not insulate Defendants' statements from liability pursuant to the bespeaks caution doctrine. *See, e.g., In re Am. Express Co. Sec. Litig.*, No. 02 Civ. 5533 (WHP), 2004 U.S. Dist. LEXIS 5497 (S.D.N.Y. Mar. 31, 2004); *Regeneron*, 2005 U.S. Dist. LEXIS 1350, at *40 (finding that "the safe harbor provision does not protect a statement made with 'actual knowledge' that it was false and misleading"); *see also* 15 U.S.C. §78u-5(c)(1)(B).

Here, Defendants have admitted that sales were weak in February and March and possessed information through the Lowe Report that forewarned them of the negative consequences of discontinuing coupon-based promotions at the acquired May stores at the time they issued the false and misleading statements. The Lowe Report warnings were confirmed when Defendants discontinuance of coupon-based promotions caused sales at the acquired May stores to decline

beginning in September 2006 and continuing throughout the Class Period.  Defendants' alleged false and misleading statements were made with knowledge of the failed strategy and declining sales based on daily, weekly and monthly sales reports available to Defendants throughout the Class Period.

Further, the statements were not "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. §78u-5 (emphasis added.); *see also Irvine*, 2003 U.S. Dist. LEXIS 9342, at *4 (finding generic cautionary language to be insufficient); *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 183 (S.D.N.Y. 2003) (emphasizing that cautionary language must "render reliance on the misrepresentation unreasonable").  The purported language must "precisely address the substance of the specific statement or omission that is challenged." *See In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 628 (S.D.N.Y. 2003).

Here, Defendants allude to mere boilerplate warnings that are insufficient to bring the statements within the protection of the safe harbor provision.  *See Irvine*, 2003 U.S. Dist. LEXIS 9342, at *4 (repeated general warnings did not constitute sufficient cautionary language).  For example, Defendants rely on the following statements: "Actual results could differ materially from those expressed in or implied by the forward-looking statements contained in this release because of a variety of factors, including conditions to, or changes in the timing of, proposed transactions, prevailing interest rates, competitive pressures . . . and general consumer spending levels, including impact of the availability and level of consumer debt, the effect of weather and other factors." Def. Mem. at 29-30.  The only language pointed to by Defendants which even mentions the May acquisition is also ineffectual because it fails to mention the findings of the Lowe Report or the risks associated with the discontinuance of coupon-based promotions at the acquired May stores. *See* Def.

Mem. at 30 ("In addition, there can be no assurance that the Company's execution of its post-merger strategy to rebrand May stores will improve its operating performance."). These statements cannot be considered "meaningful cautionary statements" as contemplated by 15 U.S.C. §78u-5. *See Ruskin v. TIG Holdings, Inc.*, No. 98 Civ. 1068 (LLS), 2000 U.S. Dist. LEXIS 11517, at *17-*19 (S.D.N.Y. Aug. 14, 2000). The statements have no bearing on this matter and provide no rationale as to why Defendants chose not to disclose the negative effects that elimination of coupon-based promotions were having on sales at the acquired May stores.

### E.    The CAC States a Claim Under Section 20(a)

The CAC asserts that the Individual Defendants violated Section 20(a) of the Exchange Act. 15 U.S.C. §78(t). In order to state a claim under Section 20(a), plaintiffs must allege: (a) a primary violation by a controlled person; (b) control by the defendant of the primary violator; and (c) culpable participation in some meaningful sense by the controlling person in the fraud. Section 20(a) violations are governed by Rule 8's pleading standard. *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327 (S.D.N.Y. 2007); *see also In re Van Der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 413 (S.D.N.Y. 2005) (citing *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 415 (S.D.N.Y. 2003)).

As discussed *supra,* the CAC adequately pleads primary violations of the Exchange Act. In addition, Plaintiff's allegations concerning the Individual Defendants' direct involvement in the day-to-day management of the Company and their responsibility for its statements to the public go well beyond what suffices to plead Section 20(a) liability. *Regeneron*, 2005 U.S. Dist. LEXIS 1350, at *71-*72; *see, e.g. IPO*, 241 F. Supp. 2d at 394-95; *In re Emex Corp. Sec. Litig.*, No. 01 Civ. 4886 (SWK), 2002 U.S. Dist. LEXIS 17528, at *28 (S.D.N.Y. Sept. 18, 2002) (stating that "[a]t the motion to dismiss stage, plaintiffs need only plead facts supporting a reasonable inference of control"). Plaintiffs' assertions that Defendants exerted control by virtue of their senior positions

- 23 -

within the company combined with the scienter allegations detailed in the CAC meet the bar required by Rule 8's notice pleading standard. *Tower Auto.*, 483 F. Supp. 2d 327; *see also Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101-02 (2d Cir. 2001); *Van Der Moolen*, 405 F. Supp. 2d at 413.

Moreover, by pleading that the Individual Defendants engaged in specific conduct while serving as officers and directors of Macy's during the Class Period, Plaintiff has alleged particularized facts that give rise to a strong inference not only of the power to direct and control the culpable acts of Macy's, but also participation in those acts. *See In re American Bank Note Holographics Sec. Litig.*, 93 F. Supp. 2d 424, 429 (S.D.N.Y. 2000).

## IV.     CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.[11]

DATED:  March 7, 2008

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
RUSSELL J. GUNYAN

*/s/ Samuel H. Rudman*
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

*Lead Counsel for Plaintiffs*

---

[11]     In the event that the Court deems the claims against Defendants insufficiently plead, Plaintiff requests an opportunity to amend the CAC, pursuant to Federal Rule of Civil Procedure 15. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead."). Although Plaintiff has amended the CAC once already, it was not due to any stated legal insufficiency.

## CERTIFICATE OF SERVICE

I, Samuel H. Rudman, hereby certify that on March 7, 2008, I caused a true and

correct copy of the attached:

Lead Plaintiff's Memorandum Of Law In Opposition To Defendants' Motion To
Dismiss The Consolidated Amended Class Action Complaint

Declaration of Russell J. Gunyan in Support of Lead Plaintiff's Memorandum Of
Law In Opposition To Defendants' Motion To Dismiss The Consolidated
Amended Class Action Complaint

to be served: (i) electronically on all counsel registered for electronic service for this

case; and (ii) by first-class mail to all additional counsel on the attached service list.


_____ /s/ *Samuel H. Rudman*
Samuel H. Rudman

MACY'S FEDERATED (LEAD)

Service List - 3/7/2008     (07-0126)

Page 1 of  1

**Counsel For Defendant(s)**

Arthur J. Margulies
Jones Day
222 East 41st Street
New York, NY  10017
  212/326-3939
  212/755-7306 (Fax)

John M. Newman, Jr.
Michael A. Platt
Geoffrey J. Ritts
Jones Day
901 Lakeside Avenue, North Point
Cleveland, OH  44114
  216/586-3939
  216/579-0212 (Fax)

**Counsel For Plaintiff(s)**

Samuel H. Rudman
Russell J. Gunyan
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY  11747
  631/367-7100
  631/367-1173 (Fax)